STATE OF NEBRASKA, EX REL. BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, V. EUGENE MOORE, AUDITOR OF PUBLIC ACCOUNTS.

FILED NOVEMBER 8, 1895.   No. 7997.

Vouchers: CLAIMS AGAINST STATE UNIVERSITY.   Session Laws, 1895, chapter 65, providing for a uniform system of vouchers, applies to claims against the state university.

ORIGINAL application for *mandamus* to compel the respondent to issue a warrant in payment for property purchased for the use of the University of Nebraska in accordance with the certificate of the board of regents.   *Writ denied.*

*Ricketts & Wilson,* for relator.

*A. S. Churchill, Attorney General,* and *George A. Day, Deputy Attorney General, contra.*

IRVINE, C.

The relator alleges that it purchased of one Beruh Liebisch certain philosophical treatises for the use of the University of Nebraska, to the value and at the agreed price of $22.06; that on June 26, 1895, the board of regents

having audited the account, found the same correct and
issued its certificate, signed by its president and secretary,
to the effect that Liebisch was entitled to payment of that
amount from the appropriation of 1895, account current
expenses, and directing the respondent to draw his warrant
therefor on the university fund; that thereafter the board
caused said certificate to be presented on behalf of Lie-
bisch to the respondent, Liebisch being a resident of Ger-
many; that the respondent refused to draw a warrant for
the reason that the account was not verified and vouchered
as provided by Session Laws of 1895, chapter 65. It is
further averred that there was in the treasury of the state
to the credit of the temporary university fund at that time
the sum of $9,872.50. The relator prays for a writ of
*mandamus* commanding the respondent to issue a warrant
to Liebisch in accordance with the certificate. To this pe-
tition the auditor demurs. Session Laws of 1895, chapter
65, is entitled "An act to provide for a uniform system of
vouchers for use for all disbursements of the state's funds,
through the auditing and treasury departments of the state,
and to provide for the affixing of an oath or affirmation
thereto by the claimant, and to provide a penalty for the
violation thereof." The act in its first section provides that
within thirty days after its passage and approval the au-
ditor shall prepare blank forms of vouchers for use in all
the state's departments and for use of "all manner of
claimants against the state who receive their pay by war-
rant drawn by the auditor upon the state treasurer."
Other provisions of the section relate to the issuance of
such vouchers in original, duplicate, and triplicate forms, as
necessities of the especial institutions may require. Section
2 provides: "All claims against the state to be paid as
hereinbefore provided shall be extended in full on the
voucher and fully and carefully itemized, and accompanied
in all instances, where possible, with the original bill or
item of expense. Said bills or items, and each of them,

shall give the exact date of purchase or service rendered, quantity purchased, name of article or service, price per item, and total, and shall be properly signed by the party to whom the claim is payable, or his or its agent or attorney, or a member of the firm, and shall be signed in full by the name of the claimant," etc.   Section 3 provides that with the original voucher there shall be an affidavit in form prescribed by the section.   The remaining sections of the act are not material to the present inquiry.   If this act is applicable to such claims as that now presented, neither the relator nor the claimant has shown a compliance therewith, and the writ must be denied.   The question presented is, therefore, whether the act referred to applies to claims against the university.

The university derives its revenue in part from a state tax and in part from the proceeds of two grants of land by the federal government.   One of these grants was by the act of congress of July 2, 1862, commonly known as the " Morrill Act."   The other was contained in the enabling act of April 19, 1864, section 10 of which granted seventy-two sections of land for the use and support of a state university, to be appropriated and applied as the legislature might prescribe for the purpose named, and for no other purpose.   The first state constitution contained no provision relating to either of these grants, except in sections 1 and 2 of article 7, providing that the principal of all funds arising from the sale of land granted to the state for educational purposes shall forever be preserved inviolate and undiminished ; and the income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations, and that the university lands and other educational lands shall not be sold at less than $5 an acre.   The present constitution contains in different sections substantially similar provisions, but the minimum price of sale is changed ; and it is provided that the general government of the university shall, under direction of the legisla-

ture, be vested in a board of regents, whose duties and powers shall be prescribed by law. (Constitution, art. 8, sec. 10.) There was no legislation to create the university or to give effect to these grants until 1869, when a comprehensive act was passed. (Session Laws, 1869, p. 172.) Under this act the university was created, and its general government vested in a board of regents, who are constituted a body coporate, and empowered as such to sue and be sued, to make and use a common seal, to acquire real and personal property for the use of the university and to dispose of the same whenever the university can be advantaged thereby. The only limitation to the power of the board in this respect was that they should not dispose of grounds upon which any building of the university should be located without the consent of the legislature. By this act as subsequently amended the funds of the university were declared to be two—the endowment fund and the regents' fund. The endowment fund consisted of the proceeds of the sales of lands and funds acquired by donation or bequest. The regents' fund consisted of the proceeds of investment of the endowment fund, of the rental of lands leased, tuition and text-book fees, and the state tax. In other words, the endowment fund was the principal and the regents' fund the income available for use. By act of March 2, 1870, the state treasurer was made the custodian of the endowment fund and he was required to pay over monthly to the treasury of the university all moneys accruing to the regents' fund. The treasurer of the university was authorized to pay moneys out of this fund on warrants drawn upon the secretary and countersigned by the president of the board of regents. In 1875 an act was passed (Session Laws, 1875, p. 154), entitled "An act providing for the more efficient government of the state university and for the disposition of funds belonging thereto." By this act the office of treasurer of the university was abolished and the state treasurer "made custodian of the

funds," the treasurer of the university being directed within sixty days to turn over to him all moneys, securities, books, and papers pertaining to his office.   This act also provided that disbursements from the university fund should be made by the state treasurer upon warrants drawn by the auditor, who should issue warrants upon certificates issued by the board of regents, signed by the secretary and president.   It also provided that all money accruing to the university was thereby appropriated to the use of the university.  So the legislation stood until the act of 1895 was passed.   In 1877 the effect of this legislation was drawn in question in the case of the *Regents v. McConnell*, 5 Neb., 423.   This was an action by the regents to recover from McConnell certain moneys belonging to the regents' fund which had come into his hands as treasurer of the university and which he refused to turn over to the state treasurer as required by the act of 1875. The court reviewed the legislation down to that time and declared that the board of regents of the university was not a private eleemosynary corporation, because its whole interest and franchises are the exclusive property and domain of the government itself; that it was a public corporation, and but a part of the machinery employed in carrying on the affairs of state; that upon such corporation the legislature had power to impose such modifications, extensions, or restraints as the general interest and public exigencies may require; that the rights of such corporation never become vested as against the state; that the effect of the act of 1875 was to take from the treasurer of the university the control of the regents' fund and make the state treasurer its custodian, "to be disbursed by him upon warrants drawn by the state auditor in the same manner as funds appropriated for the support of other state institutions not incorporated are disbursed."   The court further said that by virtue of the act of 1875 "the custody and control of these funds are taken from the corporation and placed in the custody of the state treasurer for disbursement; and under the settled doctrine

of the law, in respect to public corporations of this kind, the legislature had the undoubted authority to take these funds from the custody of the corporation and divest it of any corporate power over them, and having done so, we think it clear that the regents, as such corporation, have no authority in law to bring or maintain this action." Here then, two years after the passage of the act of 1875, and eighteen years ago, the court construed it as taking from the board of regents the control of the regents' fund and vesting it in the state treasurer, to be disbursed in the same manner as funds of other state institutions, and the logic of the decision reduced the university very much to the same position as other state institutions, although its distinct corporate character was affirmed. In *State v. Liedtke*, 9 Neb., 468, the court said: "Upon careful examination of the several acts of the legislature and constitutional provisions applicable to this question, we are forced to the conclusion that it was the intention of the legislature, which passed the act of February 23, 1875 (Session Laws, 1875, p. 154), that all moneys belonging to the university fund then in the hands of the treasurer of the board of regents should not only be paid over to the state treasurer, but should thereupon be covered into the state treasury, and that thereafter all like funds, upon reaching the hands of the state treasurer, would by force of law be covered into the state treasury." The court therefore held that the state treasurer acted in receiving and paying out the revenues of the university in his capacity as state treasurer, and not as treasurer of the university, and that no funds could be drawn except in pursuance of a specific appropriation. The doctrine of these two cases was reaffirmed in *State v. Babcock*, 17 Neb., 610, Chief Justice COBB dissenting, but unfortunately not writing an opinion to support his dissent; and the same line of reasoning controlled the decision in *State v. Moore*, 36 Neb., 579.

It is argued that the act of 1895 does not in terms apply

to claims against the university; that it relates only to claims against the state; that the university, being a body corporate, capable of being sued, its debts are to be enforced by suit and judgment against the corporation; that the state is not liable therefor, and its creditors are not claimants against the state; and further, that the act of 1895, if construed to apply to claims against the university, would be unconstitutional, as abridging and restricting the constitutional powers of the board of regents. We think the argument addressed to the construction of the act cannot be maintained without disregarding the decisions we have cited. For eighteen years it has been held that the university is merely a state institution and its board of regents a state agent; that the funds of the university were by the act of 1875 not merely entrusted to the state treasurer as custodian for the university, but were covered into the treasury and became a part of the state's funds entrusted to him in his official capacity as state treasurer; that for the withdrawal of such funds specific appropriations are necessary, as in the case of other state institutions. Hence the logical conclusion that the constitutional provisions and legislative enactments in regard to drawing of warrants by the auditor must apply. The legislature in passing the act of 1895 must be presumed to have had in contemplation these decisions, and the construction so given by this court to the legislation affecting the university, and, therefore, in using the term "claims against the state" it was not the legislative intent to except from the operation of the act claims against the university. So far as the constitutional question is concerned, it will be observed that while the constitution vests the general government of the university in the board of regents, this government is to be "under direction of the legislature," and the powers and duties of the board are merely such as "shall be prescribed by law;" that is, by the legislature. The decisions already cited necessarily imply such a construction of this provision as

permits to the legislature the greatest latitude in extending or restricting these duties and powers.    In *Regents v. McConnell, supra,* it was clearly the view of the court that the vesting of the general government of the university in the board of regents did not prevent the legislature from depriving the board of the control of the university funds. The act of 1895 is complete in itself, relating generally to the forms and requisites of vouchers, and must be held to have operated an implied repeal of that part of the act of 1875 which required warrants to be issued on the certificate of the board of regents.    Claims against the university must be presented to the auditor upon vouchers drawn in conformity with the act of 1895.

The foregoing has been written merely from the standpoint of authority.    We do not feel that decisions which have so long controlled the operations of the board of regents, of state officers, and of the legislature itself, in matters affecting the university, should be overruled if such a course can be avoided, and this case cannot be otherwise resolved without overruling those decisions; but we feel that we would be placing ourselves in a false attitude did we not before leaving this subject express our opinion to the effect that our minds do not assent to the reasoning of the line of decisions referred to.    Were the question a new one, we would take an entirely different view, both of the validity and the construction of the act of 1875.

WRIT DENIED.