[Civil No. 3778.   Filed September 27, 1937.]

[72 Pac. (2d) 408.]

STATE OF ARIZONA and THE BOARD OF REGENTS OF THE UNIVERSITY OF ARIZONA, a Body Corporate, Appellants, v. J. W. MISER, Appellee.

Mr. John L. Sullivan, former Attorney General, and Mr. Elmer C. Coker, his Assistant, for Appellants.

Mr. V. L. Hash, for Appellee.

McALISTER, C. J.—J. W. Miser brought an action against the State of Arizona and the Board of Regents of the University of Arizona, a body corporate, to recover a balance alleged to be due him for manual labor performed by him and four other persons. The complaint contains five causes of action. The first is based on the sum claimed by him for his own services and the other four on the amount sought by him as assignee of these other persons. He was successful in each, though for a less amount than prayed for, and the defendants have brought the judgment here for review.

The complaint alleges in substance in its first cause of action that the plaintiff was employed as a "laborer to do manual labor" on the university's experimental farm near Mesa, Arizona, on February 17, 1933, and that he worked as such until July 1, 1934, or for a period of 3,408 hours; that the statute in such cases provides that eight hours and no more shall constitute a day's work and that the minimum per diem wages fixed by the State Highway Commission for manual labor is fifty cents an hour; that at this rate he earned $1704; that the defendants paid him $1155; and that there is now due him by the defendants $549; that he made claim upon the defendants for payment of this sum and that it has been disallowed and denied.

The four additional causes of action are identical in form and amount with the first, except that each is based on the claim of another employee which was assigned to the plaintiff for collection.

Under date of June 23, 1933, the evidence discloses, the president of the university addressed a letter to the

plaintiff appointing him to the position of field assistant in the Arizona Agricultural Experiment Station at a salary of $75 per month, his work to be at the Mesa farm under the supervision of C. J. Wood and he immediately accepted the appointment in writing. His employment continued from that day until July 1, 1934, during which period he worked 3,325½ hours and was paid regularly twice a month at the agreed rate, the total sum received by him during that time being $1155.

It further appears that the plaintiff made claim for his wages in this way: The superintendent of the farm, C. J. Wood, prepared twice a month a payroll showing the name of each employee at the farm, the hours he had worked and his rate of pay. This payroll was presented to each employee for his signature, and after examining it to ascertain its correctness as to the hours he had worked and the rate of pay he was entitled to, or, at least, after having had the opportunity to do so, he signed it, whereupon Mr. Wood verified it and sent it to the comptroller of the university, who, provided it was correct in all respects, approved it and then forwarded it to the state auditor for payment. The plaintiff did not, however, sign any payroll or make any written verified claim for the additional amount he is asking for in this action, although he did on January 14, 1935, make a verbal demand therefor of Mr. Wood.

The evidence relative to the other causes of action discloses that the plaintiff's assignees had agreed to work for $70 per month, that they had been paid at that rate for all their time in the same manner as plaintiff, and that they did not sign any payroll or file a written verified claim for the additional amount sought in this action.

At the conclusion of the case the court held that the plaintiff was entitled to judgment on each cause of

action but since the liability of the defendants was one created by statute, *City of Phoenix* v. *Drinkwater,* 46 Ariz. 470, 52 Pac. (2d) 1175, he could recover only that portion of the claims that was not barred by section 2058, subdivision 3, Revised Code of 1928, the one-year statute of limitations. It then rendered judgment in his favor on the five causes of action as follows: (1) $155.50; (2) $183.00; (3) $131.66; (4) $140.84; (5) $44.15. The defendants, believing the Minimum Wage Law inapplicable to the facts of this case, or if it does apply, that the plaintiff did not bring himself within the terms of the statute giving him the right to prosecute such an action, have appealed from the judgment as well as the order overruling their motion for a new trial.

Appellants raise by proper assignment two questions of law, each of which gives a different reason why the court erred in overruling their demurrer to the complaint and in denying their motion for a new trial. The first is that the complaint does not allege that prior to the commencement of the action appellee or his assigns had filed verified claims for the amounts in controversy in accordance with the provisions of sections 30, 2619 and 4379, Revised Code of 1928, and that the same had been disallowed, this being a necessary condition precedent to the right to sue if the Board of Regents of the University, a body corporate, must be regarded as the state, or an arm thereof, for the purposes of the Minimum Wage Law. The second is that in view of the provisions of section 1135, Revised Code of 1928, and the "Educational Institutions Act of 1934," chapter 7, Third Special Session, 1934, the Board of Regents of the University, which is a body corporate, is not subject to the terms of section 1350, Revised Code of 1928, as amended by chapter 12, section 1, Session Laws of 1933, commonly referred to as the "Minimum Wage Law." If either

of these contentions is sound the judgment cannot stand, and since the second is directed to the merits rather than to a matter of procedure it will be disposed of first.

The pertinent part of the Minimum Wage Law, section 1, chapter 12, Session Laws of 1933, under which appellee is seeking to recover additional wages, reads as follows:

"Not less than the minimum per diem wages fixed by the state highway commission for manual or mechanical labor performed for said commission or for contractors performing work under contract with said commission, shall be paid to persons doing manual or mechanical labor so employed *by or on behalf of the state or any of its political subdivisions.*" (Italics ours.)

It will be observed that the minimum per diem wage provided for herein applies specifically to those employed by or on behalf of the state or any of its political subdivisions, though it does not define what is meant by the terms, "state" and "political subdivisions," as here used. This must be ascertained from the context and the meaning generally attached to them. It is clear, however, in fact has been decided by this court, that the expression, "political subdivisions," in this connection, includes counties, *State* v. *Anklam,* 43 Ariz. 362, 31 Pac. (2d) 888, and cities and towns, *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799. But appellee does not claim that the University of Arizona comes within the meaning of this term, though he does seriously urge that it is an arm, branch or agency of the state for educational purposes and that as such falls within the purview of the term, "state," as used in the Minimum Wage Law, the same as does the prison, the industrial school, the state hospital, the pioneers' home, or any other department of state government. The position of appellants, upon the

other hand, is that though the university is an agency of the state for the purpose of providing its inhabitants "with the means of acquiring a thorough knowledge of the various branches of literature, science and the arts," section 1130, Revised Code of 1928, the fact that the legislature has in sections 1130 to 1155 of the Revised Code of 1928, established the "University of Arizona," made it a body corporate and given it certain powers indicates that it was not the intention of that body by use of the word, "state," in the Minimum Wage Law to include the university any more than it was to do so by employing the expression, "political subdivisions." They refer particularly to sections 1132 and 1135, which read as follows:

"§ 1132. *University a corporate entity.* The regents of said university shall constitute a body corporate with the name and style 'board of regents of the university of Arizona' and by that name shall be known; shall have perpetual succession; may sue and be sued; may purchase, receive, hold, and sell property, real and personal, for the benefit of the state of Arizona and the use of said university; may contract and be contracted with; and adopt a corporate seal."

"§ 1135. *Powers of board; appointment of professors; salaries; tuition.* The board shall enact ordinances for the government of the university; appoint and employ a president of the university, and professors, instructors, lecturers, and other officers and employees, and fix and determine the salaries of the persons so appointed and employed; remove any officer or employee when in its judgment the interests of the university require; fix all fees to be charged by the university and graduate the same as between residents, non-residents and students from foreign countries."

It is clear from these and other sections pertaining to the university that the board of regents is given complete control in the management of its affairs, in-

cluding the expenditure of its funds, and that the only restriction placed upon it in paying these out is that they must be used for the purpose for which they were appropriated. Section 1135, it will be noted, makes it the duty of the board of regents to "appoint and employ a president of the university, and professors, instructors, lecturers, and other officers and employees, and fix and determine the salaries of persons so appointed and employed," thus placing wholly within its hands the power to say who shall enter the service of the university, from president to janitor, and to decide how much salary he shall receive. It is not questioned that the board had this power in all its fullness up to the enactment of chapter 12, Session Laws of 1933, but the query is now presented whether it still has it, that is, whether the Minimum Wage Law modified or impliedly repealed that portion of section 1135, which empowers it to fix and determine the salaries of those of its employees who do manual and mechanical labor.

While appellee does not deny that the duty to fix the compensation of these particular employees still devolves upon the board of regents, he contends that its power in that respect has been restricted by section 1, chapter 12, Session Laws of 1933, in such a way as to require it to fix at least a minimum wage for them, its right to set any it may desire above that being unaffected. This position rests upon the theory that the university is an agency of the state for educational purposes, that its employees are compensated for their services out of state funds and, hence, that the legislature, by inserting the language, "by or on behalf of the state," in the Minimum Wage Law meant to embrace every employee doing manual or mechanical labor for the state, including those working for the university. Appellants do not dispute the fact that the university is a state agency for educa-

tional purposes or that its employees are paid out of public funds but they contend that the legislature had no intention of placing that institution among the agencies of the state to which the Minimum Wage Law applies, because it had theretofore made the board of regents a body corporate and given it full power in the management of the affairs of the university, including the right to sue and be sued, purchase, hold and sell property, real and personal, enter into contracts, and expend, as it deems expedient, the funds of the university. While it is not questioned that the legislature had the power to include it, or could in fact, have placed any restriction it saw fit upon the expenditure of the funds appropriated to the university, yet the fact that prior to 1933 it had never attempted anything of this kind but had left the university's affairs, including the fixing of salaries and wages of its employees, completely in the hands of the board of regents, indicates, it is argued, that it was not its intention in the enactment of the Minimum Wage Law to depart from this policy, even in so slight a particular. If such had been its purpose, it is claimed, it would have given effect thereto specifically, since the board of regents had been made a body corporate and its power over the university's affairs conferred upon it by a special act, for it is a general rule of construction and, therefore, the presumption of law is that a special act is not repealed by a general one on the same subject, though this is not true where it is clear that the purpose of the general law is to modify or repeal the special act in any particular. *Favour* v. *Frohmiller*, 44 Ariz. 286, 36 Pac. (2d) 576; 59 C. J. 931, par. 536. In that case a general law is sufficient.

There was no direct repeal in this case, but the terms of the Minimum Wage Law are as general as it is possible to make them and so definitely embrace every person employed by the state in any of its

agencies and paid for his work out of public funds that it is not apparent how the purpose to include all of them could have been any more clearly stated. The legislature evidently intended to place every employee doing manual or mechanical labor for the state on the same basis, and, this being true, one cannot believe that its purpose was that those performing this class of work for the university should be treated any differently from those doing it for other state institutions, such, for instance, as the prison, the industrial school, the pioneers' home, the state hospital or any of the other departments of the state government. Certainly the legislature did not intend that a' part of those employed by the state to do manual or mechanical labor should be beneficiaries of the Minimum Wage Law and that others should not. The expression, ''persons doing manual or mechanical labor,'' includes every person falling within that class and omits none. The fact that the university is incorporated does not make it any the less an arm, branch or agency of the state for educational purposes, and affects in no particular the power of the legislature over it. The appropriations to it are just as much public funds as are those set aside for the maintenance of unincorporated state institutions. Control of the university by a board of regents is a wise policy, one that has been followed from the beginning and will continue, but this does not imply that the legislature, in adopting a law applying in terms to every state employee doing manual and mechanical labor, intended to exclude from its benefits that portion of those workers employed by the university merely because it is an incorporated institution and managed by a board. Since the legislature evidently felt that all persons doing manual and mechanical labor for the state should be paid at least a minimum wage, those employed by its incorporated as well as

its unincorporated institutions, it is not reasonable to presume that the slight invasion of the control by the board of regents the passage of such a law would entail would have led it to enact one inapplicable to any employee doing manual or mechanical labor for any of the state's agencies, whether incorporated or unincorporated. It cannot be that the legislature purposely passed a Minimum Wage Law uniform in terms but intended to be discriminatory in operation.

In support of their contention that the legislature did not intend that the university should be subject to the Minimum Wage Law, appellants cite *Fairfield* v. *J. W. Corbett Hdwe. Co.*, 25 Ariz. 199, 215 Pac. 510, 511, and *Board of Regents* v. *Sullivan*, 45 Ariz. 245, 42 Pac. (2d) 619, but we are unable to see wherein either has any bearing on that question. They both dealt with the power of the board of regents to perform certain acts, and there is here no question of power but merely one of intention on the part of the legislature. In the second case, chiefly relied on by appellants, the court had before it the question whether the university, an agent of the state for educational purposes, could, pursuant to the power specifically conferred upon it by the "Educational Institutions Act of 1934," issue its bonds in the sum of $623,000, and pledge its fees, rental and other revenues in payment thereof, without obligating the state itself therefor and consequently without violating the constitutional provision limiting the debt of the state to $350,000. A majority of the court, following the weight of authority and what it felt to be the better reasoning, held that it could, but that holding, and the same would be true of the opposite conclusion had it been reached, is wholly immaterial here, because there can be no question but that the legislature, even though the university is a distinct corporate entity, could, if it so desired, apply the Minimum Wage Law to those

of its employees that do manual or mechanical labor, the same as it could to those doing this class of work in unincorporated state institutions. Even though the corporate character of the university was so distinct that the legislature could empower it to issue its bonds as it did, it by no means follows that its separate existence as a corporate body was so independent that the legislature could not restrict its use of the funds appropriated to it by requiring it to pay a minimum wage to those of its employees coming within the terms of that law. It was just as much within the province of the legislature to lessen the power of the board of regents, as in the case of the Minimum Wage Law, as it was to add to it, as it did in the ''Educational Institutions Act of 1934.''

██ The suggestion that the closing sentence of section 1350, Revised Code of 1928, as that section was amended by chapter 12, section 1, Session Laws of 1933, following immediately the language requiring the payment of a minimum wage and stating that ''Persons doing manual or mechanical labor employed by contractors or sub-contractors in the execution of any contract with the state, or with any of its political subdivisions, shall be deemed to be employed by or on behalf of the state, or of such political subdivision thereof,'' indicates that the Minimum Wage Law may have been intended to apply only to persons working for contractors or sub-contractors in the execution of a contract with the state or any of its political subdivisions is, as I view it, without basis. That sentence, to my mind, was inserted merely to require that those employed by contractors or sub-contractors in the execution of a contract with the state or any of its political subdivisions should, for the purposes of the Minimum Wage Law, be regarded as state employees and treated in the matter of wages as though they had

been employed directly by the state or any of its political subdivisions.

■ ■ The conclusion that the university comes within the term, "state," as used in the Minimum Wage Law, renders necessary a consideration of one other proposition. Appellants demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action or confer jurisdiction of the subject-matter on the court in that it did not allege that prior to the institution of his action appellee had filed with the proper officers a verified claim for the amount sued for and that it had been disallowed. The court overruled the demurrer and, notwithstanding the testimony of appellee himself and his assignors that no verified claim for the amount sued for had been filed by him or them with anyone, rendered judgment in his favor. Both orders are assigned as error, the contention of appellants being that, since a sovereign state may be sued only with its consent, the provision of the statute prescribing the course to be followed in prosecuting an action against it constitutes a condition precedent to the right to sue, and in the absence of an allegation that a verified claim had been filed and disallowed, no cause of action is pleaded, and in the absence of proof thereof none established. Appellants concede that the state may be sued for a claim of that character since the legislature, pursuant to section 18, part 2, article IV of the Constitution, directing it to provide by law "in what manner and in what courts suits may be brought against the State," enacted section 4379, Revised Code of 1928, reading as follows:

*"Authorized for claims on contract or negligence.* Persons having claims on contract or for negligence against the state, which have been disallowed, may on the terms and conditions herein contained, bring ac-

tion thereon against the state, and prosecute the same to final judgment.''

It will be observed that the right to sue the state is given those having *claims* against it on contract or for negligence *that have been disallowed,* and while the language of this section merely provides a remedy to enforce a liability existing under general law and does not create a cause of action where none existed before, *State* v. *Sharp,* 21 Ariz. 424, 189 Pac. 631, and *State* v. *Dart,* 23 Ariz. 145, 202 Pac. 237, yet, in prosecuting those that fall within the limitations it prescribes, it is necessary that it be done in accordance with the provisions of the statute dealing with that subject. In 25 R. C. L., p. 416, is found this language:

''If the state consents to be sued, it is only in the manner it prescribes. And all persons seeking to avail themselves of the privilege so granted must accept it subject to the terms and conditions attached thereto or forming a part of the right as granted by the state.' Thus, the state has a right to couple with its consent to be sued a condition that the suit be brought in one of its own courts, or to limit the right to sue to certain specified causes. Permission to sue the state may be withdrawn or denied at any time the legislature may think proper, even to the extent of abating pending suits. Statutes permitting suits against the state must be strictly construed, being in derogation of its sovereignty. . . . ''

The following sections of the Revised Code of 1928 provide the manner in which claims against the state shall be presented, approved and paid:

''§ 30. *Claims against state, how presented.* Persons having claims against the state shall exhibit the same, sworn to, with the evidence in support thereof to the auditor, to be audited, settled and allowed, within one year after such claim shall accrue, and not afterwards; and no claim shall be audited or allowed the items of which are not specifically set out.''

"§ 2619. *Presentation, approval and payment of claims.* All claims against the state for an obligation authorized, required or permitted to be incurred by any state officer or agency, and not payable out of any special fund, or in a special manner, shall be paid only in the following manner: The claimant shall present an itemized claim, sworn to by him and approved by the head official of each office or state agency under which the obligation was incurred, or by some other officer thereof, if expressly authorized to approve; then presented to the state auditor and, if approved by him, he shall draw his warrant therefor on the state treasurer, who shall pay the same when countersigned by the governor and only out of the appropriation made therefor."

Appellee is required under these two sections to allege that he presented his verified claim for the amount sued for to the proper officer, and under section 4379 that it was disallowed, before his complaint states a cause of action or sets up facts conferring jurisdiction of the subject-matter on the court, because these requirements are conditions that must be complied with before the right to sue the state comes into being. *Utah Const. Co.* v. *Highway Com.,* 45 Wyo. 403, 19 Pac. (2d) 951; *Gates* v. *State,* 128 N. Y. 221, 28 N. E. 373. In *Goodhope* v. *State et al.,* 50 S. D. 643, 211 N. W. 451, 452, the court used the following language:

"It was for the Legislature to specify the conditions under which an action might be brought against the state. It has specified, as a condition precedent to the bringing of an action under said section 2109, that the allowance of the claim must have been refused by the state auditor. *Lyman County* v. *State,* 9 S. D. 413, 69 N. W. 601. Under such circumstances, it is not for this court to say that the presentation of the claim to the state auditor would have been an idle act. The condition precedent specified by the Legislature must have been complied with in order to authorize the bringing of this action in this court under said section 2109."

In view of the foregoing provisions of the code the status of a claim against the state and of one against the county, in so far as enforcing their collection by suit is concerned, would seem to be the same, hence, the statement made many years ago in *Smith* v. *County of Mohave,* 2 Ariz. 27, 8 Pac. 160, reading as follows, is still the law of Arizona (Rev. Code 1928, § 761):

"The right to sue a county remains unimpaired, and extends to every case of account *after presentation to and rejection by the board of supervisors.*"

Appellee contends, however, that not one of the three sections quoted above applies to his claim, because section 4379 refers only to claims payable out of the general fund and his, instead of being one of these, falls within the class specially mentioned in section 2619 as "payable out of any special fund, or in a special manner." This contention is, in our judgment, unsound. Section 4379, even though it refers to claims payable from the general fund, and these only, includes appellee's notwithstanding, because his is payable out of the moneys appropriated to the university for its maintenance, and the particular portion of the general fund allocated to it for this purpose, as well as that set aside to other institutions and departments of the state, does not, by the mere act of appropriation change its character from a general to a special fund. The only difference is it is then no longer unappropriated. While the warrant is payable out of the general fund, it is charged to that particular portion of it that has been allocated to the institution or department concerned. The general appropriation bill itself always directs the state auditor to draw warrants on the state treasurer to the amounts and for the purposes therein specified, and then states that the "treasurer is hereby authorized and directed

to pay said warrants out of the *general fund of the
state and the appropriation for the respective state
agencies herein made.*" (Italics ours.) Section 2615,
Revised Code of 1928, provides that the general fund
"shall consist of all moneys belonging to, or for the
use of the state, paid into the treasury thereof, and
not belonging to any special fund," and then enu-
merates nineteen special funds, no one of which in-
cludes or refers to the appropriations in the gen-
eral appropriation bill. And while the legislature
has, since the enumeration of these special funds
in the Financial Code of 1922 (Rev. Code 1928,
§ 2614 et seq.) created others, none of them includes
the legislative appropriation from the general fund
to an institution or department.

Neither does the expression, "in a special manner,"
apply to appellee's claim. Employees of the uni-
versity are paid in the same general way as other state
employees. The facts show that the payroll contain-
ing the days or hours worked and their rate of pay is
signed by them, verified by the head of their depart-
ment, turned over to the comptroller of the university
for approval and then forwarded by him to the auditor
for payment. If it is found to be within the purpose
of the appropriation to that institution, the auditor
draws a warrant in payment of it, section 28, Revised
Code of 1928, and the Governor countersigns the war-
rant, section 29, Revised Code of 1928. The fact that
"within the scope of its duties" the board of regents
"is supreme," *Fairfield* v. *J. W. Corbett Hdwe. Co.,*
*supra,* does not, as appellee argues, relieve the auditor
from the duty of approving the claims of university
employees for wages or the Governor from counter-
signing the warrants in payment thereof, any more
than it relieves these officers from performing this
same duty when the claims and warrants of other
state employees are involved. It is the duty of the

auditor before issuing a warrant in payment of a claim, including those approved by the university authorities, to know that the claim is for services falling within the purpose of the appropriation against which the warrant is to be charged, and if it is not, disapprove it.

Inasmuch, therefore, as it does not appear that appellee, before instituting his action, filed with the proper officers, a verified claim for the amount he seeks to recover and that the same had been disallowed, the complaint failed to state a cause of action or allege facts showing jurisdiction of the subject-matter. The judgment is, therefore, reversed and the case remanded for action in accordance herewith.

LOCKWOOD, J. (Concurring).—I agree most emphatically with the conclusion reached by Chief Justice McALISTER that the University of Arizona, whatever its legal form, is but an agency of the State of Arizona, created for the purpose of carrying out one of the most important governmental functions of the state, to wit: the education of its citizens, and with the very clear and, to my mind, convincing reasoning by which he sustains this conclusion.

I also agree that as the university is in substance, though not in form, the state itself that any claims against it are governed by the rules laid down for other claims of a similar nature against the state, and that since the record shows that appellee did not comply with those rules he cannot recover in the present action.

I confess, however, that I am unable to follow the reasoning by which apparently he still contends that, while the university is in substance the state when the Minimum Wage Law is concerned, it is not such under circumstances set forth in the case of *Board of Regents* v. *Sullivan, supra.* However, since the re-

sult reached by him in the present proceeding is clearly the law, the inconsistency of the two cases is immaterial.

ROSS, J. (Concurring).—I concur in the result of Justice McALISTER'S opinion but not in his reasoning and feel that I should state why.

The State of Arizona is not liable for the wages of employees of the university and it should not have been made a party. The indebtedness, if any, was incurred and is owing by the University of Arizona and not by the state. If the state auditor, providing the claims were legal charges against the university, should have refused to allow them, or if the state treasurer, there being funds in the current appropriation for the university to meet them, should have refused to pay warrants drawn therefor, these officers might properly have been made parties and compelled to do their duty of auditing or paying the claims. The state contracts no debts for the university. It has by a special act incorporated such institution and expressly conferred on it the power and duty of engaging its president, professors, teachers, and other employees and of fixing their salaries. Section 1135, Revised Code of 1928. The university is a separate legal entity, just as much so as the Southern Pacific Railroad Company or the Phelps-Dodge Corporation; "may sue and be sued; may purchase, receive, hold, and sell property, real and personal, for the benefit of the state of Arizona and the use of said university; may contract and be contracted with; and adopt a corporate seal." Section 1132, Id. So, the Board of Regents of the University of Arizona alone could have incurred the indebtedness and it alone should have been sued.

It is shown that the university paid plaintiff and his assignors everything it agreed to pay them and

that the amounts sued for are claimed under what is commonly referred to as the Minimum Wage Law. That law, it seems to me, does not reach the university and its employees and was never intended to. The minimum wage provisions are a part of chapter 24, Revised Code of 1928, entitled "Employer and Employee" (section 1350 et seq.), as amended by chapter 12, Laws of 1933. The persons entitled to be paid the minimum *per diem* wages fixed by the State Highway Commission are "persons doing manual or mechanical labor employed by or on behalf of the state, or of any of its political subdivisions." See section 1350 as amended. The university is not a political subdivision of the state. Its functions are not political and, besides, it operates all over the state, every part alike. If it be suggested that persons doing manual or mechanical labor for the university are "employed by or on behalf of the state" and come within the terms of the Minimum Wage Law, I would call attention to the legislature's definition of that phrase. The last sentence of section 1350, *supra,* as amended by Laws 1933, chap. 12, § 1, says:

"Persons doing manual or mechanical labor employed by contractors or sub-contractors in the execution of any contract with the state, or with any of its political subdivisions, shall be deemed to be *employed by or on behalf of the state,* or of such political subdivision thereof." (Italics mine.)

The phrase is confined to persons working in the "execution of any contract with the state, or with any of its political subdivisions." There is no showing that plaintiff or his assignors were working in the execution of any such contract. At most it is shown that they were working for the university, on its experimental farm, for wages, but not in the execution of any contract with the state.

The language of the legislature seems very clear to me that it intended to limit the minimum wage to contracts with the state and its political subdivisions, and not to reach out and cover the state university. Of course it could have employed language showing an intent and purpose to place the university in the same category as cities and towns, the counties and the state but it did not do so. I think the whole context of chapter 24, Revised Code of 1928, entitled "Employer and Employee," as amended, when read and considered, negatives any intention on the part of the legislature to extend the Minimum Wage Law to the university and its employees.

The penalty fixed by section 1353, Revised Code of 1928, as amended by chapter 12, Laws 1933, indicates very strongly the meaning the legislature intended to give the preceding sections in said chapter. This section reads:

"Sec. 1353. *Violations Defined; Penalty.* Any officer of the state or any of its political subdivisions, or any person acting under or for such officer or any contractor or sub-contractor of the state, or any political subdivision thereof, *or other person* violating any provision of the eight preceding sections of this article, is guilty of a misdemeanor and shall for every offense be punished by a fine of not less than fifty dollars, nor more than one thousand dollars, or by imprisonment not more than six months, or both such fine and imprisonment." (Italics mine.)

The regents of the university (with the exception of the Governor) are not officers of the state, or any of its political subdivisions, or contractors or sub-contractors thereof, and yet these or "other person" are the only persons punishable for violating the Minimum Wage Law. "Other person" cannot reasonably or fairly be held to refer to the members of the board of regents, for nowhere in the chapter is

used any language referring to the University of Arizona or its regents or placing any duty on them in connection with the Minimum Wage Law.