(No. 6600.   October 25, 1938.)

STATE ex Rel. J. W. TAYLOR, Attorney General, Plaintiff, v. W. L. ROBINSON, G. W. SUPPIGER, and FRANK LANGLEY, Constituting and Being the INDUSTRIAL ACCIDENT BOARD OF THE STATE OF IDAHO, and MYRTLE P. ENKING, Treasurer of the State of Idaho, Defendants.

[83 Pac. (2d) 983.]

J. W. Taylor, Attorney General, and R. W. Beckwith, E. G. Elliott and Lawrence B. Quinn, Assistant Attorneys General, for Plaintiff.

Vestal P. Coffin, for Defendants.

GIVENS, J.—Chapter 12, 1935 Session Laws, Third Extraordinary Session, page 20, provides, in cooperation with the Federal Government under 42 U. S. C. A., sec. 501 et seq., for so-called unemployment compensation, whereby employers in certain businesses and occupations in this state pay a graduated excise tax into the State Treasury which is thence turned over to the Federal Government, and where there is, as herein, cooperation between the two sovereignties, 90 per cent of the funds thus collected are returned to the state for compensation benefit payments, 10 per cent being retained by the Federal Government for expenses of administration (herein by the Industrial Accident Board and its appointees) of the state act, relieving the State from the same.

A comprehensive plan for the determination of payments is contained within the act and the Industrial Accident Board is authorized to withdraw from the unemployment trust fund with the Secretary of the Treasury of the United States Government such amounts not exceeding the amounts standing to the credit of the State therein, as the board deems necessary for the payment of current benefits, such withdrawals carried into the State Treasury to be used solely for the payment of benefits as determined by the unemployment officials

under the jurisdiction of, and as approved by, the Industrial Accident Board.

In the case at bar the Attorney General contends the ensuing individual unemployment benefit claims against the fund must be approved by the State Board of Examiners, while the Industrial Accident Board takes the position that while in the custody of the state treasurer after return from the United States Treasury the unemployment compensation fund is, in effect, a trust fund in which the state has no property interest and that therefore any claim against the fund is not a ''claim against the state'' within the meaning of article 4, section 18, Idaho Constitution. Defendant's statement that ''the question here presented for decision is whether the Unemployment Compensation Fund is a trust fund in which the State has no property interest, or merely public moneys belonging to the State in which it has the entire property interest,'' is not quite correct. The question is whether a claim against such fund is, under the above constitutional provision, a claim against the State.

Defendants rely largely on *State v. State Board of Education,* 33 Ida. 415, 196 Pac. 201, which held charges against the University of Idaho were not claims against the State within the meaning of the above constitutional provision. The court, however, therein so held on two grounds: First, that the State Board of Education was a constitutional corporation, succeeding by the Constitution to all the rights and privileges of the Board of Regents brought into existence at the time the University was established by the Territorial Legislature prior to the adoption of the Constitution, and that as such constitutional corporation, therefore the highest form of juristic person known to the law and of independent authority, had its own treasurer and fiscal set-up and thus within the scope of its authority in regard thereto was of equal dignity with the State, the State Board of Examiners, and not subservient thereto; that to require such claims to go before the State Board of Examiners, would place the State Board of Examiners in control of, in effect, a coordinate constitutional board; and second, that the endowment funds were trust funds. There is nothing in *State v. State Board of*

*Education, supra,* which indicates the court would have decided as it did merely on the ground the funds there involved were trust funds, and if the State Board of Education had not been a constitutional board. The Industrial Accident Board is a statutory, not a constitutional body. (Sec. 43–1301, I. C. A.)

The language of the statute herein does not in express terms provide that payments should or should not go before the State Board of Examiners. It does provide the funds shall be placed in the State Treasury, and no additional bond is required of the state treasurer in connection therewith, whence it would appear the legislature considered them as public funds and that the treasurer's general bond would be liable therefor (sec. 57–807, I. C. A.), otherwise they might be unprotected.

It is argued because the tax is collected from a limited class it is not strictly a state tax and not being derived as a general or public tax, is, therefore, not public monies and constitutes only a proprietary trust fund so private in its nature that it could not be the basis for claims against the state. There are, however, numerous taxes limited as to those liable for the payment thereof, which have always been considered state funds and require claims against the same to be passed upon by the State Board of Examiners.[1]   See footnote.

It is argued also that because contribution is made by the Federal Government in part the fund is a trust fund and is not under the State Board of Examiners. The same condition exists however, with regard to federal contribution for construction of roads, and other somewhat similar coopera-

[1] Claims against the State Insurance Fund under the workmen's compensation statute, sec. 43–1727, I. C. A., Sheep Inspection Fund, sec, 24–106, I. C. A., Bee Inspection Fund, sec. 22–1915, I. C. A., Sess. Laws 1933, p. 313, chap. 172, Pest Abatement Fund, secs. 22–1503, 22–1504, I. C. A., Glanders Indemnity Fund, sec. 24–502, I. C. A., Abortion Eradication Fund, sec. 24–602, I. C. A., State Predatory Animal Fund, sec. 24–2206, I. C. A., Public Welfare grants-in-aid trust fund, 1937, Sess. Laws, p. 328, chap. 194, Federal grants-in-aid under the public assistance law, 1937, Sess. Laws, p. 372, chap. 216, and the Cooperative Emergency Revenue Fund, 1937, Sess. Laws, p. 435, chap. 244.

tive enterprises, claims in connection with which, so far as we are advised, go before the State Board of Examiners.

Defendants further claim the State has no property interest in the fund. If the State cooperates with the Federal Government all expenses are paid by the Federal Government, but 10 per cent of the State tax goes to the Federal Government or is retained by it for that purpose; and the state, by the declared purpose in section 2 of the act, has undertaken as a State activity the attempted amelioration of unemployment and employing citizens in certain classes are taxed for that purpose. Thus the State has, in so far as is necessary to bring the fund within the provisions of art. 4, sec. 18, Idaho Constitution, a sufficient property interest, and by reason of its declared and extended paternal activities, a personal interest, in seeing that the fund is collected and properly disbursed under the plan of the statute, because if not so disbursed this plan may fall short of the desired result or another plan have to be substituted.

Counsel for defendants argue that payments must be made promptly and if not so made the Federal Government will withdraw its approval and cooperation and a greater burden fall upon the State. But the Federal Government by approving the state act and plan must have done so in contemplation of the state Constitution and law safeguarding the expenditure of funds of the State either solely its own or made up of contributions from the Federal Government or otherwise, and hence in effect by such approval recognized and approved the guardianship of the State Board of Examiners.

''Since the state act has been approved by the proper federal authority, it must be assumed that such approval carried with it an approval of the state act as it could constitutionally operate in this state and that some national bank or banks in this state would be designated for deposit of the state unemployment funds. When a federal reserve or a member bank within this state is so designated and the unemployment fund is deposited therein by the respondent treasurer, there is no violation of the section of the State Constitution referred to. It must be conceded that the moneys so contributed under the act are not public moneys

in the sense that they are subject to appropriation other than as provided in the act. The funds thus raised are in their nature a continuing appropriation for a specifie purpose. See *Daugherty v. Riley*, 1 Cal. (2d) 298, 34 Pac. (2d) 1005. The balances therein do not revert to the general fund at the end of the fiscal year and under both the state and the federal acts constitute trust funds to be administered by the state commission and subject to its call at all times. Although these funds are required to be deposited in a federal reserve or member bank in this state, the federal government does not obtain title to the money but holds it in trust for the beneficiary—the state commission, which in turn is bound to administer it by the payment of benefits without diminution for administration purposes. The fact that these funds must be deposited with a national bank should not destroy their character as a deposit as contemplated by the State Constitution. Being moneys 'in the custody' of the state, they are subject to such deposit within the law.'' (*Gillum v. Johnson*, 7 Cal. (2d) 744, 62 Pac. (2d) 1037, 1043, 63 Pac. (2d) 810, 108 A. L. R. 595.)

It may well be argued the Federal Government would feel more secure as to the proper administration of this plan if under the supervision of the constitutional authoritative officers of the State than if under no State supervision. The State is as much interested in the success of the plan as any arm of the State, and the people of the State through the Constitution have placed the State Board of Examiners as the final arbiters of expenditures. The property interest of the State in University funds is protected by the constitutional Board of Education; its property interest in all other funds, claims or fiscal affairs without exception or limitation are, as to claims against them, perforce under the constitutional Board of Examiners.

While no doubt these funds are in a sense held in trust both by the federal and state governments, when they are requisitioned back into the State Treasury for benefit disbursement title must necessarily rest in the State since it can be nowhere else, and a claim thereto is, therefore, a claim against the State even though only as trustee. Since benefit

payments are restricted to these funds, there is all the more reason for all constitutional safeguards, and the plain construction of the all-inclusive terms of the Constitution, i. e., "all claims against the State, except salaries or compensation of officers fixed by law" leads to no other conclusion. (65 C. J. 429.)

No reflection upon the board or any of its employees is intended or asserted by this argument, but the Constitution sets up what were considered by its framers as essential safeguards as to the expenditure of public funds generally. All funds in the hands of and under the control of the State— the only exception being as to the coordinate constitutional body the State Board of Education—must be disbursed under the supervision and control of the State Board of Examiners, and the people by not amending the Constitution in these particulars have continued to sanction and leave effective these safeguards, and asserted expediency, if there be such, may not dissolve them. (*People v. George*, 3 Ida. 72, 26 Pac. 983.)

It is urged the State Board of Examiners has not the skill or necessary help and office force to properly pass upon these claims; that such work is highly technical, that the officers in charge of the determination and disbursement of these funds in the Unemployment Division of the Industrial Accident Board's activity alone are competent to do this work. Even if such be true, which the record does not disclose, the remedy is with the people of the State and not this court, and other states have evidently not considered there is any such insurmountable difficulty in the actual operation, of having the constitutional supervising body pass upon claims of this nature.

"The additional requirement of section 22 of article 4 of the State Constitution that all money in the state treasury, however appropriated, shall be drawn 'upon warrants duly drawn thereon by the Controller,' is mandatory. The Legislature may not disregard it and all parties dealing with money in the state treasury are bound by it. No good reason has been advanced why such compliance with it should not be observed or why such compliance would unduly burden

the operation of the statutory plan.'' (*Gillum v. Johnson, supra*, at p. 1043.)

Defendants argue language in *Charles C. Steward Machine Co. v. Davis*, 301 U. S. 548, 57 Sup. Ct. 883, 81 L. ed. 1279, 109 A. L. R. 1293, sustains their position, but while the precise point involved herein was not there before the court or decided, a careful reading of the opinion discloses expressions more consonant with plaintiff's position herein (pp. 1294, 1295):

''A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books. For anything to the contrary in the provisions of this act they may use the pooled unemployment form, which is in effect with variations in Alabama, California, Michigan, New York, and elsewhere. They may establish a system of merit ratings applicable at once or to go into effect later on the basis of subsequent experience. Cf. §§ 909, 910. They may provide for employee contributions as in Alabama and California, or put the entire burden upon the employer as in New York. They may choose a system of unemployment reserve accounts by which an employer is permitted after his reserve has accumulated to contribute at a reduced rate or even not at all. This is the system which had its origin in Wisconsin. What they may not do, if they would earn the credit is to depart from those standards which in the judgment of Congress are to be ranked as fundamental. Even if opinion may differ as to the fundamental quality of one or more of the conditions, the difference will not avail to vitiate the statute. In determining essentials Congress must have the benefit of a fair margin of discretion. One cannot say with reason that this margin has been exceeded, or that the basic standards have been determined in any arbitrary fashion. In the event that some particular condition shall be found to be too uncertain to be capable of enforcement, it may be severed from the others, and what is left will still be valid.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

''Thus, the argument is made that by force of an agreement the moneys when withdrawn must be 'paid through public employment offices in the State or through such other

agencies as the Board may approve.' Section 903 (a) (1). But in truth there is no agreement as to the method of disbursement. There is only a condition which the state is free at pleasure to disregard or to fulfill. Moreover, approval is not requisite if public employment offices are made the disbursing instruments. Approval is to be a check upon resort to 'other agencies' that may, perchance, be irresponsible. A state looking for credit must give assurance that her system has been organized upon a base of rationality.''

Certainly what is constitutional is rational. And both the majority opinion written by Justice Cardoza and the dissents by Justices McReynolds and Sutherland considered these monies when in the hands of the state for disbursement as ''state funds.'' Justice Sutherland (pp. 1304, 1305) stating:

'' . . . . But it is to be observed that the payment is to be made to the state *agency,* and only such amount as that agency may *duly* (italics Justice Sutherland's) requisition. It is hard to find in this provision any extension of the right of the state to withdraw its funds (underscoring ours) except in the manner and for the specific purpose prescribed by the act.''

From which would necessarily follow that a claim thereto would be a claim against the State.

And the Supreme Court of the United States has considered these exactions as taxes:

'' . . . . In *Beeland Wholesale Co.· v. Kaufman,* 234 Ala. 249, 174 So. 516, *supra,* the Supreme Court of Alabama held that the contributions which the statute exacts of employers are excise taxes laid in conformity to the constitution and laws of the state. While the particular name which a state court or legislature may give to a money payment commanded by its statute is not controlling here when its constitutionality is in question (cases) we see no reason to doubt that the present statute is an exertion of the taxing power of the state (cases.)'' (*Carmichael v. Southern Coal & Coke Co.,* 301 U. S. 495, 57 Sup. Ct. 868, 81 L. ed. 1245, 1252, 109 A. L. R. 1327.)

In the absence of clear exception or explanation, taxes become, when collected, public monies, and classified therefor as "state funds."

" . . . . Support of the poor has long been recognized as a public purpose, see *Kelly v. Pittsburgh,* 104 U. S. 78, 81, 26 L. Ed. 658, 659. We need not labor the point that expenditures for the relief of the unemployed, conditioned on unemployment alone, without proof of indigence of recipients of the benefits, are a permissible use of state funds." (*Carmichael v. Southern Coal & Coke Co., supra,* p. 1256.)

If public monies, a claim thereto is a claim against the State.

"There is argument as to the proper designation to be given this fund, (for inspection of grain in warehouses) which it is conceded is properly in the state treasury, whether it consists of excess fees or whether it is a trust fund without a name. We do not think it is material by what name it shall be designated. The facts are it was paid and collected as fees under the provisions of the act of 1933, and, under the rule of *State v. Moore,* 46 Neb. 373, 64 N. W. 975, was not merely entrusted to the state treasurer as custodian, but was actually in the treasury and became a part of the state's funds entrusted to the treasurer in his official capacity as such officer." (*Bollen v. Price,* 129 Neb. 342, 261 N. W. 689, 691.)

The case is distinguishable from *State v. State Board of Education, supra,* because holding a mere state agency not a constitutional board is, in effect, as to expenditures under the control of such an officer as the Board of Examiners.

"From this title it appears that the Legislature intended to make an appropriation 'for the state employment service' and that such appropriation was intended to be made 'out of the state employment service fund.' The important and substantive thing they proposed to do was to make an appropriation for the use of the state employment service. The particular fund or account, as carried on the books of the auditor and treasurer, was of minor consequence, for the reason that *it was state money* they were appropriating no matter what its designation on the books." (*Robinson v. Enking,* 58 Ida. 24, 9 Pac. (2d) 603, 604.)

" . . . . It will not do to say that because license fees are placed upon and collected from a class, to wit, attorneys, and paid into the state treasury that the expense of carrying out the provisions of the act is not an expense to the state. To so hold would in effect be to say that the license fees so paid into the state treasury are not state moneys, and the purposes for which the money so raised is used are private and not public in their nature. A main source of revenue of this state is money derived from license fees. Shall we say that because these fees are collected from classes of persons in the state, that for such reason they are not state moneys, and if these moneys are, in turn, appropriated the purposes for which they are used are not an expense of the state? License moneys paid into the state treasury are state moneys and if legally paid out, must be for expenses of the state." (*Jackson v. Gallet,* 39 Ida. 382, 389, 228 Pac. 1068.)

See, also, *State ex rel. Hansen v. Parsons,* 57 Ida. 775, 69 Pac. (2d) 788, and *In re Edwards,* 45 Ida. 676, 692, 266 Pac. 665.

The following authorities so far as applicable, in principle at least, support plaintiff: *State v. Miser,* 50 Ariz. 244, 72 Pac. (2d) 408; *Nevada-California Elec. Corp. v. Corbett,* 22 Fed. Supp. 951.

Judgment for plaintiff and permanent writ issued.

Holden, C. J., and Morgan, Ailshie, and Budge, JJ., concur.