BRAY v DEPARTMENT OF STATE

Docket No. 65164. Argued April 7, 1983 (Calendar No. 1).—Decided
    December 1, 1983. Rehearing denied post, 1202. Certiorari
    denied by the Supreme Court of the United States on June 18,
    1984.
Willie Bray and others brought an action in the Wayne Circuit
    Court against the State of Michigan and various departments
    and agencies, seeking recovery of half of a $45 annual fee
    which they were required to pay in 1973 in order to register
    their uninsured motor vehicles. They claimed that because the
    no-fault act, which prohibited operation of a vehicle without
    insurance, became operational midway through the registration
    year, they were entitled to a refund of half the fee. The court,
    Horace W. Gilmore, J., held that the adoption of the no-fault
    act impaired a contractual relation between the state and the
    plaintiffs and that the plaintiffs were entitled to refunds on
    constitutional grounds. The Court of Appeals, T. M. Burns, P.J.,
    and Bashara and N. J. Kaufman, JJ., affirmed (Docket No.
    43329). The defendants appeal.

    In an opinion by Justice Brickley, joined by Chief Justice
    Williams and Justices Ryan, Cavanagh, and Boyle, the Su-
    preme Court held:

    The annual uninsured motorist fee was in the nature of a tax
    and not of a contract or a license. There was no express or
    implied legislative intent to refund the fee, and no refund is
    due to the plaintiffs.

    1. In paying the annual fee required under the Motor Vehicle
    Accident Claims Act in order to register an uninsured vehicle,
    the plaintiffs clearly were not buying insurance or a license to
    operate an uninsured vehicle, nor were they securing any
    benefits as a class. The fund financed by the fees was for the
    benefit of persons injured by uninsured, underinsured, or uni-
    dentified motorists, and the authority of the Secretary of State
    to suspend operator's licenses and vehicle registrations of unin-
    sured drivers against whom there were uncollected judgments
    made the class more vulnerable following adoption of the act

REFERENCE FOR POINTS IN HEADNOTES
[1-3] 71 Am Jur 2d, State and Local Taxation §§ 15-18, 612, 613.

than before. The state did not enter into anything in the nature of an insurance contract with the plaintiffs.

2. Before the enactment of the Motor Vehicle Accident Claims Act, motorists were permitted to drive uninsured vehicles. The act was not intended to regulate the driving of uninsured vehicles by requiring the payment of a fee for a license to drive an uninsured vehicle. Rather, the Legislature intended that the fund provided by the fees collected from uninsured motorists would be used to compensate persons injured by uninsured motorists. That fee was in the nature of a privilege tax, designed to raise revenue, payable at the time of registration of an uninsured vehicle. Events occurring after a tax is due, in the absence of legislative intent to the contrary, are irrelevant. No provision was made for refund of any portion of the tax on the basis of subsequent events.

Reversed.

Justice Levin, joined by Justice Kavanagh, dissenting, would refund any surplus remaining in the uninsured motorist fund, or any surplus which would have remained had interest due the fund been paid, to those assessed to create the fund. The fee was collected from a specific group to meet a specific problem related to that group. It could not validly have been levied either as a regulatory fee or as a tax. Rather, it was an assessment. Because the fee was not assessed for general revenue purposes, it cannot be placed in the general fund, but must be used exclusively for the purpose for which it was intended. Once the purpose was met, any surplus should have been refunded to those assessed.

1. The Motor Vehicle Accident Claims Act did not provide liability insurance for uninsured motorists, although it did provide benefits for the victims of uninsured motorists akin to those provided by insurance. The fees paid by owners of uninsured vehicles did not create any contractual rights between the state and uninsured motorists. Those motorists remained primarily liable for their torts and were responsible to reimburse the Motor Vehicle Accident Claims Fund fully for claims paid on their behalf.

2. The uninsured motorist vehicle fee could not have been levied validly as a regulatory fee because it exceeded the cost of registering and identifying motor vehicles. In addition, the fund was not intended to be used for regulatory purposes. There is no meaningful difference between insured and uninsured motorists in terms of the costs to the state of regulating their driving. Accordingly, a regulatory scheme charging owners of

uninsured vehicles one fee for the privilege of driving and owners of insured vehicles another would not have been valid.

3. Nor could the fee have been levied validly as a tax. To so characterize the fee would place the act in conflict with the constitution. Specific taxes imposed on motor vehicles were required to be used exclusively for highway purposes. The Legislature has not defined support for the victims of uninsured motorists as a highway purpose, and a tax on the registration of uninsured vehicles to provide for such victims could not be sustained under the constitution. Also, a non-ad valorem tax must be uniform upon the class on which it operates. A tax which would impose a fee of $45 on some owners and only $1 on others for a highway purpose would violate that provision.

4. An assessment of owners of uninsured vehicles for the purpose of providing a fund for the benefit of the victims of uninsured motorists could not validly be levied as a tax under the constitution. A tax is an exaction for the support of the state. The uninsured vehicle fee raised money to provide for a particular need having a sufficient nexus with those assessed to justify the imposition. The fee, collected as an assessment, was validly exacted.

5. The purposes for which funds acquired by special assessment may be spent must be rigidly defined, and the money must be segregated from all other accounts. The state was required to segregate the Motor Vehicle Accident Claims Fund from the general fund. That duty was disregarded when the accumulated assets of the claims fund were transferred to the general fund. The state, additionally, had the duty to ensure that interest was paid on the monies collected for the claims fund. Money collected by special assessment is a trust fund, and the governmental body collecting the money is the trustee of the fund. The conduct of the governmental trustee is measured by the same standards as that of a private trustee. The failure of the state to pay interest on the money transferred from the claims fund to the general fund was in violation of its fiduciary duty. To allow the state to borrow money from a trust fund raised by a special assessment of a discrete group of persons without the payment of interest would enable it to do indirectly what it cannot do directly—to enlarge the general fund at the expense of the trust. It would subject the members of the discrete group to further assessment necessitated by a shortfall of funds resulting from the state's use of money belonging to the trust fund without the payment of interest. Had the interest been paid, the claims fund might have a surplus.

6. When the purpose of a special assessment has been met,

any money remaining belongs to those assessed in proportion to the amount of their contribution. Absent claims by those intended to be benefited by the fund or further legislation enlarging the benefits, money that would be in the fund but for the state's failure to pay interest must be returned to those from whom it was exacted.

97 Mich App 33; 294 NW2d 236 (1980) reversed.

OPINION OF THE COURT

1. AUTOMOBILES — UNINSURED MOTORISTS — MOTOR VEHICLE ACCIDENT CLAIMS ACT.

The annual fee imposed by the Motor Vehicle Accident Claims Act upon owners of uninsured motor vehicles at the time of registration was in the nature of a tax and not a license or insurance premium, and did not establish a contractual relation between the owners and the state; the fee was designed to raise revenue to compensate persons injured by uninsured, underinsured, or unidentified motorists, not to regulate the driving of uninsured vehicles, and was not refundable (MCL 257.1101 et seq.; MSA 9.2801 et seq.).

DISSENTING OPINION BY LEVIN, J.

2. AUTOMOBILES — UNINSURED MOTORISTS — MOTOR VEHICLE ACCIDENT CLAIMS ACT.

The annual fee imposed by the Motor Vehicle Accident Claims Act upon owners of insured and uninsured motor vehicles at the time of registration was not a tax or a regulatory fee, but was an assessment to provide a fund for the victims of uninsured motorists; the money collected was required to be used exclusively for that purpose, and once the purpose was met, any surplus should have been refunded to those assessed (Const 1963, art 9, §§ 3, 9; MCL 257.1101 et seq.; MSA 9.2801 et seq.).

3. AUTOMOBILES — UNINSURED MOTORISTS — MOTOR VEHICLE ACCIDENT CLAIMS FUND.

The state, in exacting a special assessment from motorists to be paid to the Motor Vehicle Accident Claims Fund, was required to segregate the money collected and to ensure that interest was paid on the assets of the fund (1971 PA 19; 1971 PA 63; MCL 257.1103[1]; MSA 9.2803[1]).

*Harry S. Ellman* and *Barris, Sott, Denn & Driker* (by *Donald E. Barris* and *Sharon M. Woods)* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Harry G. Iwasko, Jr., Louis J. Porter,* and *Warren R. Snyder,* Assistants Attorney General, for the defendants.

BRICKLEY, J. This is the culmination of a decade of litigation involving two trips up the judicial ladder of this state. It involves the desire of the plaintiffs, a class of some 350,000 Michigan residents, to each recover half of a $45 annual fee they were required to pay in order to register their uninsured motor vehicles in 1973, the last year uninsured motorists were permitted to operate their vehicles on Michigan roads. It is their claim that having paid for a full year's "privilege of driving an uninsured motor vehicle", the inauguration of the state's mandatory no-fault insurance act on October 1, 1973, midway through the registration year, entitled them to a refund.

Following two separate hearings before the circuit court and corresponding review by the Court of Appeals, the case comes to us following a holding that: 1) the $45 annual fee for uninsured motorists provided for in the Motor Vehicle Accident Claims Act, MCL 257.1101 *et seq.;* MSA 9.2801 *et seq.,* the proceeds of which went to a fund for the benefit of the victims of accidents involving uninsured and unidentified motorists, "could be said to represent an annual insurance premium" which established a contractual relationship between the state and the uninsured motorist, a relationship that is a property right protected by the Fourteenth Amendment of the United States Constitution; 2) that the no-fault insurance act, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* terminated that contractual relationship; and 3) that the contract right impaired by the state can be redeemed by a refund of a pro-

rata portion of the annual $45 fee. It was the judgment of the Court of Appeals that because the pro-rata refund to which the plaintiffs were entitled was required on constitutional grounds it should be forthcoming from the state, irrespective of the resources of the Motor Vehicle Accident Claims Fund, the repository of the contested fee.

It is our conclusion that there is no legal or factual basis for finding that the MVACA is in the nature of an insurance policy for plaintiffs or that the required fee established any contractual rights. We find that the uninsured motorist fee is more in the nature of a tax than either a license fee or an insurance premium. We find no federal or state constitutional infringement of plaintiffs' rights occasioned by the enactment of the no-fault insurance act. Therefore, there is no contractual, statutory, or constitutional basis for concluding that the state is liable to plaintiffs. The history of this case follows.

In 1965, the Legislature enacted the Motor Vehicle Accident Claims Act, 1965 PA 198. As amended, the act provided that "[e]very person registering an uninsured motor vehicle in this state shall pay annually at the time of registering, in addition to any other fee prescribed by law, a fee of $45.00". 1971 PA 19, § 3(3). The act further provided that it would be a misdemeanor for anyone who had not paid the fee to drive an uninsured motor vehicle. 1971 PA 19, § 3(7). Insured motorists were originally required to pay a $1 fee.[1] 1965 PA 198, § 3(3).

---

[1] Uninsured motorists were required to pay a $25 fee by 1965 PA 198, § 3(2). The fee was raised to $35 by 1968 PA 223, § 3(2), and to $45 by 1971 PA 19, § 3(3). In 1971, the Legislature waived payment of the $1 fee by insured motorists whenever the fund had a surplus of 40% or more greater than the fund's combined gross claims and claim expense reserves. 1971 PA 19, § 3(5). The $1 insured motorist fee was not collected for the 1971, 1972, or 1973 registration years.

The act provided that the proceeds of these fees would go into the Motor Vehicle Accident Claims Fund "for the payment of damages for injury to or death of certain persons or property damage", that is, persons who had the misfortune of being injured by uninsured, underinsured, or unidentified motorists. The Secretary of State, who was responsible for the fund, was subrogated to the rights of the injured parties as against the uninsured drivers. MCL 257.1106(4); MSA 9.2806(4). Uninsured motorists against whom there were unsatisfied judgments owing either to an injured party or the fund and with whom the Secretary of State had not been able to make a repayment arrangement were made subject to the revocation both of their driver's licenses and their automobile registrations. MCL 257.1106(6); MSA 9.2806(6).

On October 31, 1972, the no-fault act, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* was approved by the Legislature. It provided that on October 1, 1973, in addition to the introduction of the no-fault concept, all motorists must be insured and must provide evidence of insurance. MCL 500.3101, 500.3101a; MSA 24.13101, 24.13101(1).

In August of 1973, nine months after the passage of the no-fault insurance act and two months before it became operational, plaintiffs commenced this action, seeking a declaration of their rights and a refund of half of the $45 uninsured motorist's fee paid in 1973. The suit was initiated in the Court of Claims; but, by stipulation of the parties, it was moved to the Wayne Circuit Court. The some 350,000 uninsured motorists constituting the plaintiff class claimed, from the outset, that the $45 that was required to be paid the preceding March 31 was a license fee for the privilege of driving an uninsured motor vehicle, and that they

paid the $45 "with the understanding and agreement" that they could continue to drive their uninsured vehicles until April 1 of the following year without the necessity of obtaining motor vehicle insurance. They aver that by adopting the no-fault insurance act and by making it operational on October 1, 1973, the state unilaterally, midway through the year, canceled what they had paid for for an entire year. Plaintiffs claim "that logic, public policy, and the legal rights" of their class dictate a return of half of that $45 fee. They claim that the "defendants have breached the contract entered into" with the plaintiffs.

Over a year later, in November, 1974, the trial court issued what was to be only the first opinion in this case. The trial court declared the $45 payment to be a license fee and that, as such, the plaintiffs had received only half of the "protection" under the license that they had paid for, entitling them to a refund.[2] In reaching its decision, the court expressly declined to consider the various constitutional claims of plaintiffs and based its decision, apparently, on equitable principles.

In May, 1976, the Court of Appeals upheld plaintiffs' claim for a refund, but on different grounds. *Bray v Dep't of State,* 69 Mich App 172, 178; 244 NW2d 619 (1976). The Court found that the $45 fee did not fit "neatly into either category" of license fee or tax. It found the fee to be "unique"

---

[2] Plaintiffs' complaint also sought a refund of interest on monies transferred by the Legislature from the fund to the general fund. 1971 PA 19, § 3a, authorized this transfer at an interest rate "to be determined annually by the legislature". Pursuant to 1973 PA 59, § 2, the money was repaid to the fund without interest. Plaintiffs have cross-appealed from the conclusion of the trial court and the Court of Appeals that the trial court had no power to substitute its judgment as to a proper interest rate for that of the Legislature. Our conclusion on the necessity of a refund obviates a decision on this matter.

and "to be designed to establish a state administered insurance program similar in some respects to a private insurance program. The $45 fee thus could be said to represent an annual insurance premium paid by those who have not acquired private insurance policies." The Court then referred to MCL 500.3020; MSA 24.13020, which requires a private insurer to refund the excess portion of a premium paid by an insured when there is an interruption in the policy period. Applying the rationale that the uninsured motorist fee was, in effect, an insurance policy for the plaintiffs and that the policy period was interrupted, the Court held that an appropriate portion of the fee should be refunded. But, because plaintiffs were not the primary beneficiaries of the so-called insurance policy (those having a claim against an uninsured driver being the primary beneficiaries), plaintiffs were not entitled to their refund until the Motor Vehicle Accident Claims Fund had satisfied all of the claims and potential claims of the primary beneficiaries. The matter was remanded to the circuit court for further proceedings. Application for leave to appeal to this Court was denied on September 9, 1976. 397 Mich 851.

On remand, the trial court decided to consider the constitutional arguments raised in the first hearing. The court applied the theory of the Court of Appeals that a contractual relationship between plaintiffs and the state existed, as in the nature of an insurance policy. It found that this contractual relationship was impaired by the adoption of the no-fault insurance act and that the impairment violated the Contract Clauses of the United States and Michigan Constitutions, US Const, art I, § 10; Const 1963, art 1, § 10, and the Due Process Clause

of the Fourteenth Amendment of the United States Constitution. The court then concluded that a constitutional entitlement to the refund overrode the priority of other claimants to the fund.

The Court of Appeals affirmed the decision of the trial court, reasserting the contractual relationship and adopting the circuit court's constitutional findings to the extent that the adoption of the no-fault insurance act midway through the 1973 registration period amounted to a "taking" or diminution of a property interest. It also adopted the trial court's finding that, because the relief was constitutionally required, the right to the refund was absolute. 97 Mich App 33; 294 NW2d 236 (1980).

Leave to appeal to this Court was granted on June 8, 1981. 411 Mich 972.

We first deal with the two basic theories on which plaintiffs' relief in the lower courts was founded. The theory propounded by the plaintiffs, with great consistency in their travels through the lower courts, was that during the automobile registration year of 1973 they paid $45 as a license fee for driving an uninsured motor vehicle for 12 months. The basic theory of the lower courts was that the effect of the plaintiffs' payment of $45 was to engage the state in a contractual relationship, a relationship that was impaired by the adoption of the no-fault insurance act midway through the 1973 registration year. An analysis of each theory depends on an examination of the nature of the extraction of the $45 fee by the state from its uninsured motorists.

That examination indicates to us that the plaintiffs were clearly not buying anything, and, contrary to the Court of Appeals position that it was akin to the buying of insurance, we find nothing to

indicate that plaintiffs as a class were securing
any benefits. If anything, in exchange for the $45
paid under the Motor Vehicle Accident Claims
Act, rather than being insured, they were made
more vulnerable in the area of automobile liabil-
ity. The fund that plaintiffs' fees were financing
was clearly not primarily for the benefit of the
uninsured motorists. Prior to 1965, those who were
injured by uninsured and uncollectible drivers
often found it useless to attempt to perfect their
claims and secure judgments. After the passage of
the MVACA, they had good reason to do so be-
cause of the possibility of collecting from the fund
within the limits provided by the act. They were
required to subrogate their interests to the Secre-
tary of State, who then could pursue the unin-
sured motorist. The Secretary of State had a
weapon that the injured motorist did not have, his
ability under the MVACA to suspend both the
operator's licenses and motor vehicle registrations
of those against whom there were uncollected
judgments and who had not entered into arrange-
ments with the Secretary of State for repayment.
The plaintiff class was clearly made more vulnera-
ble by the passage of the MVACA. If there were
any benefits received by the plaintiff class, those
benefits elude us.[3]

---

[3] Plaintiffs could, of course, recover from the fund for damages
suffered because of the acts of other uninsured motorists. This right
was granted to all persons who suffered such damage, existed inde-
pendent of one's status as an uninsured motorist, and, therefore,
cannot be considered a benefit giving rise to any contract rights in an
uninsured motorist qua uninsured motorist.

This lack of an especial benefit to the uninsured motorist likewise
precludes the conclusion that the uninsured motorist fee was a special
assessment. An especial benefit to the assessed group is the *sine qua
non* of a special assessment. See *Dukesherer Farms, Inc v Dep't of
Agriculture (After Remand)*, 405 Mich 1; 273 NW2d 877 (1979);
*Newman v City of Indianola*, 232 NW2d 568 (Iowa, 1975); *Heavens v
King County Rural Library Dist*, 66 Wash 2d 558; 404 P2d 453 (1965).

The Court of Appeals itself, in other decisions, has reinforced our conviction that the state had not entered into anything in the nature of an insurance contract with the plaintiffs. In *Weisberg v DAIIE,* 36 Mich App 513; 194 NW2d 193 (1971), the Court held that the Motor Vehicle Accident Claims Fund was not a substitute for personal insurance for uninsured motorists and, in *Abbott v Secretary of State,* 84 Mich App 23; 269 NW2d 292 (1978), *lv den* 406 Mich 940 (1979), it held that the Secretary of State represented the fund, not the uninsured motorists. The payment of a fee was not, in our judgment, a payment for specific services or rights and cannot be considered to have created an insurance contract. Accordingly, plaintiffs' claims under the Contract and Due Process Clauses must fail.

We next deal with the contention that the fee paid was a license fee. License fees are paid to engage in activities that the state has a right to regulate, if not prohibit. Hunting and fishing license fees, occupational fees, and driver's license fees are examples. Without paying these fees, citizens are normally precluded from the activities or the privileges licensed, and it is well-settled law in this state that the amount of the fees charged must be related to the costs of the regulation. *Vernor v Secretary of State,* 179 Mich 157; 146 NW 338 (1914); *Merrelli v St Clair Shores,* 355 Mich 575; 96 NW2d 144 (1959). There is considerable authority that a claim for recovery of license fees, even in cases where they were illegally collected in the first instance, is difficult to establish. See, *e.g., Beachlawn Building Corp v St Clair Shores,* 370 Mich 128; 121 NW2d 427 (1963). If we were to conclude that the fee was a license, it would still fall to the plaintiffs to establish a basis

for a refund notwithstanding the termination of the license halfway through the license year.

The plaintiff class, prior to the enactment of the MVACA in 1965, was entitled to drive uninsured motor vehicles. There is no indication in the MVACA that the state wished to curtail driving by uninsured motorists. What the state clearly wanted to do was to raise money to solve a problem. The problem it wished to solve was the increasing number of motorists injured by uninsured and uncollectible drivers. In order to provide a fund to protect that class, money was raised from the group that caused the problem, the group represented by the plaintiff class.[4] Once it was decided to raise the money from that class, what better time and way to collect it than at the time of registering the motor vehicle? There was never a showing that there was a desire on the part of the state to regulate the uninsured motorist.

In its first opinion in this case, the Court of Appeals stated:

"Although MVACA, on its face, appears to grant permission to uninsured motorists to drive their uninsured vehicles, it was not intended primarily as a registration provision. The title of MCL 257.1101 *et seq.;* MSA 9.2801 *et seq.,* makes this clear. It states:

" 'An Act providing for the establishment, maintenance, and administration of a motor vehicle accident claims fund for the payment of damages for injury to or death of certain persons or property damage arising out of the ownership, maintenance, or use of motor vehicles in the state in certain cases and to provide penalties for violation of this act.'

"Also the fact that there is a separate statute, MCL

[4] Earmarking the proceeds of a tax for a specific fund or special purpose, as is frequently the case in Michigan's scheme of taxation, rather than the general fund does not make the exaction any less a tax.

257.1 *et seq.;* MSA 9.1801 *et seq.,* which deals specifically with registration of motor vehicles, both insured and uninsured, indicates that MVACA was not intended as a licensing provision. This is further indicated by the fact that fees imposed under MCL 257.1 *et seq.;* MSA 9.1801 *et seq.,* which are much lower than the MVACA fee, cover licensing and administration expenses." 69 Mich App 178.

We agree. Simply because the state chose to enforce payment of the fee by suspending the licenses and registrations of the offending motorists does not transform the collection of the fee into a licensing and regulatory scheme.

We find the fee paid by plaintiffs to be in the nature of a tax.

A tax is designed to raise revenue. *Merrelli v St Clair Shores,* 355 Mich 575; 96 NW2d 144 (1959). As we explained in *Dukesherer Farms, Inc v Dep't of Agriculture (After Remand),* 405 Mich 1, 15-16; 273 NW2d 877 (1979):

"Exactions which are imposed primarily for public rather than private purposes are taxes. See *People ex rel the Detroit & H R Co v Salem Twp Board,* 20 Mich 452, 474; 4 Am Rep 400 (1870). Revenue from taxes, therefore, must inure to the benefit of all, as opposed to exactions from a few for benefits that will inure to the persons or group assessed. *Knott v Flint,* 363 Mich 483, 499; 109 NW2d 908 (1961); *Fluckey v Plymouth,* 358 Mich 447, 451; 100 NW2d 486 (1960)."

The MVACA was obviously designed to raise revenue. As we have previously explained, the revenue raised by the MVACA did not inure to the benefit of the group assessed. The fund existed for the public purpose of providing certain compensation to all those persons injured by uninsured motorists. The Legislature did not, however, by taxing

those who caused a problem, engage the state in any express or implied contractual or licensing arrangement. The Legislature simply chose the most appropriate group to tax. And despite plaintiffs' arguments to the contrary, we find that no refund of this tax is due.

Plaintiffs argue that if the MVACA is considered a tax its collection violated the provisions of Const 1963, art 9, § 3, which requires that a non-ad valorem tax be "uniform upon the class or classes on which it operates." Plaintiffs argue that after October 1, 1973, there was only one class—insureds—and that, as a result, the portion of the tax attributable to the period from October 1, 1973, to March 31, 1974, was unconstitutional.

Relying on *Goodenough v Dep't of Revenue,* 328 Mich 56; 43 NW2d 235 (1950), plaintiffs further argue that as of October 1, 1973, they were illegally taxed for a privilege that, in fact, no longer existed. Both of these arguments fail to recognize the nature of a tax.

The MVACA fee can only be viewed as a tax for the privilege of operating an uninsured motor vehicle. The obligation to pay a privilege tax is due on the date set by law. Events occurring after the tax liability is due, in the absence of legislative intent to the contrary, are irrelevant. See *Holland Hitch Co v Michigan,* 318 Mich 474; 28 NW2d 242 (1947); *Case v Detroit,* 129 Mich 298; 88 NW 626 (1902); *Ecorse Screw Machine Products Co v Michigan Corp and Securities Comm,* 1 Mich App 414; 136 NW2d 758 (1965), *aff'd* 378 Mich 415; 145 NW2d 46 (1966).

Plaintiffs were required to pay the uninsured motorist tax at the time they registered their uninsured vehicle. MCL 257.226, 257.1103(3); MSA 9.1926, 9.2803(3). 1971 PA 19, § 3(3), provided:

"Every person registering an uninsured motor vehicle in this state *shall pay annually at the time of registering* in addition to any other fee prescribed by law, a fee of $45.00." It did not say that, if 30 days from the registration and the payment of the fee a person were to decide to purchase insurance, he could get a refund of 11/12 of the $45 fee, nor did it say that, if a person were to purchase and register a new uninsured motor vehicle halfway through the year, he would pay only half of the $45 fee. It merely set a fee and the time and circumstances for paying the fee. We find no evidence in the act of a legislative intent to alter the basic principle that a tax is due on the date set by law and nonrefundable regardless of later events.

What evidence of a legislative intent that does exist shows that the Legislature considered and rejected the idea of refunding a portion of the uninsured motorist fee. HB 5215 (1973), which would have reconciled the MVACA with the then recently enacted no-fault act, provided for such a refund. Over strongly worded dissents, HB 5215 (1973) was passed by the House, but was never reported out of the Senate Committee on Commerce. See 4 Michigan House J (1973), pp 2882-2906; 3 Michigan Senate J (1973), p 2463. SB 1323 (1974), which was substantially similar to HB 5215 (1973) except that it made no provision for a refund, was passed by both houses and became 1974 PA 223. See 3 Michigan House J (1974), pp 2342-2343; 2 Michigan Senate J (1974), pp 1158, 1365, 1625. This history makes it clear that the Legislature intended no refund.[5]

---

[5] In a footnote to their brief, plaintiffs also argue that the uninsured motorist tax violated Const 1963, art 9, § 9 which, prior to its amendment by House Joint Resolution F, proposal M, ratified November 7, 1978, provided:

We find *Goodenough, supra,* to be distinguishable. There, the plaintiffs, nonresident trustees of trusts having their situs in Pennsylvania, were subjected to an intangibles tax. This Court held that the plaintiffs could not be validly taxed on a privilege that they did not possess in this state. In this case, the tax was on uninsured vehicles. Plaintiffs are members of the class of persons who operated uninsured vehicles. They were not being taxed for a privilege or status they did not possess at the time of taxation.

We find the uninsured motorist fee to be in the nature of a tax. Because we have found that no contractual or licensing arrangement existed between plaintiffs and the state, plaintiffs' constitutional claims are without merit. Because there is no express or implied legislative intent to refund the fee, plaintiffs are due no refund.

Reversed.

WILLIAMS, C.J., and RYAN, CAVANAGH, and BOYLE, JJ., concurred with BRICKLEY, J.

LEVIN, J. *(dissenting).* This cause concerns a governmental exaction that is difficult to label. The circuit court and the Court of Appeals characterized the exaction as a "license fee"[1] and as an

---

"All specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after the payment of necessary collection expenses, be used exclusively for highway purposes as defined by law."       .

The MVACA does not define the compensation of persons injured by uninsured motorists as a highway purpose.

We need not decide whether the uninsured motorist fund falls within prior legislative definitions of highway purposes or whether the MVACA implicitly is such a definition, because plaintiffs seek only a refund. The proper relief for a validly imposed, but unconstitutionally spent, tax is to enjoin the improper spending. Plaintiffs have requested no such relief.

[1] The circuit court first found that the fee represented a one-year

"insurance premium" respectively,[2] holding in appellees' favor under both labels. Today, the majority advises appellees that they may not recover because the "uninsured motorist fee is more in the nature of a tax than either a license fee or an insurance premium".[3] Persuaded that appellees did not have an insurance contract with the state and that the $45 exaction could not have been levied validly as either a regulatory fee or as a tax, we agree with the Attorney General's statement[4] that the exaction is best viewed as an assessment.

---

license and that appellees were entitled to a 50% refund because their license was canceled halfway through the year. The Court of Appeals affirmed in part, reversed in part, and remanded. Stating that the exaction "could be said to represent an annual insurance premium" and noting that Michigan law provides that an insurer must refund the excess portion of the premium paid by the insured if a private insurance policy is canceled, the Court of Appeals agreed with the circuit court that appellees were entitled to a refund of $22.50 plus interest if the Fund contained enough money to provide both a refund of $22.50 plus interest to each plaintiff and payment of all legitimate claims filed by persons entitled to recover from the Fund. The Court of Appeals went on, however, to hold that appellees must wait for their refund until the MVACA's three-year statute of limitations had run and those persons harmed by uninsured vehicles had recovered. *Bray v Dep't of State,* 69 Mich App 172, 178-179; 244 NW2d 619 (1976).

[2] On the second trip up the judicial ladder, both the circuit court and the Court of Appeals found that appellees had suffered a taking of property without due process because the state had "effectively terminated" a valid "contract of insurance". *Bray v Dep't of State,* 97 Mich App 33, 42; 294 NW2d 236 (1980).

[3] *Ante,* p 154.

[4] On November 10, 1981, in oral argument before this Court, the Assistant Attorney General described the exaction as follows:

"What we have is something completely different and I don't know why it was never picked up. It was mentioned in one of our briefs in the Court of Appeals briefly, in fact just a line. *But what it was is very clear. It was an assessment. Not a tax, but an assessment.* And keep in mind what this Court said in *Dukesherer v Dep't of Agriculture,* 405 Mich 1. The distinction between a tax and an assessment is that a tax is for general revenue purposes [and] can be used for anything. *An assessment is for a very limited purpose, and it is primarily to the benefit of those who pay the assessment. That is exactly what we have here."* (Emphasis added.)

Although somewhat dissimilar from traditional "special assessments", the exaction was levied against a specific group to meet a specific problem related to that group;[5] the exaction was not, and could not validly have been, levied against this specific group for general revenue purposes.[6] The money collected for the Motor Vehicle Accident Claims Fund (Fund), including the interest that should have been paid to the Fund on moneys borrowed by the state from the Fund, must accordingly be segregated from the general fund and used exclusively for the purpose for which it was intended. Once the purpose of the Fund has been

---

[5] As the majority notes (ante, p 159, fn 3) special assessments traditionally involve an especial benefit to the assessed group. The strength of the law, however, is its ability to adapt established doctrines to new fact situations. See generally Levi, An Introduction to Legal Reasoning, pp 1-27, 102-104. Indeed, in Dukesherer Farms, Inc v Dep't of Agriculture (After Remand), 405 Mich 1; 273 NW2d 877 (1979) (discussed in Part IV), this Court, analogized a levy against cherry producers to provide money to promote marketing to cases concerning special assessments for street improvements, drains, and sewers, and on that basis rejected a challenge to the levy as an unconstitutional delegation of the taxing power to private persons. As set forth in Parts II and III of this opinion, the uninsured vehicle fee could not constitutionally have been levied as a regulatory fee or as a tax. Although the uninsured vehicle fee was not a traditional "special assessment" (levied for the benefit of those especially assessed) it does not follow that the incidents of such an especial exaction or assessment cannot or should not be those that attach to other valid governmental exactions, such as special assessments, that cannot constitutionally be levied as a regulatory fee or as a tax. Clearly an exaction that cannot constitutionally be levied as a regulatory fee or as a tax should not be called a tax because it is not a traditional "special assessment".

[6] One can agree with the majority that "[e]armarking the proceeds of a tax for a special fund or special purpose * * * rather than the general fund does not make the exaction any less a tax", (ante, p 161, fn 4), without agreeing with its conclusions. As set forth in Part III of this opinion, the uninsured vehicle fee could not constitutionally have been levied as a tax. Even if the fee exacted would have been constitutional as a tax, money earmarked for a specific purpose may be required to be kept in a separate fund and may not be transferable to the general fund. See State ex rel Masterson v Ohio State Racing Comm, 97 Ohio App 108; 124 NE2d 786 (1954); McGraw v Hansbarger, — W Va —, —; 301 SE2d 848, 857-858 (1983); 81A CJS, States, § 228, pp 797-799.

met, any surplus remaining in the Fund, or that would have remained had the interest due the Fund been paid, should, absent legislation providing for an enlargement of the benefits consistent with the purpose of the Fund, be refunded to those assessed to create the Fund.

I

We agree with the majority's conclusion that there is no legal or factual basis for holding that the Motor Vehicle Accident Claims Act provides liability insurance for the appellees or that the required fee established any contractual rights.[7] Although the MVACA provided benefits to the victims of uninsured motorists akin to those provided by insurance, it was not an insurance program from the standpoint of the uninsured motorist. Uninsured motorists remained primarily liable for their torts without regard to whether the $45 annual fee had been paid and were legally responsible to reimburse the Fund fully for claims that the Fund paid on their behalf. The Secretary of State had no duty to defend uninsured motorists. Unlike insurance contracts,[8] the MVACA did not provide for one party protecting another party from loss arising from named risks in return for the payment of consideration.

II

We also agree with the majority that although the authority of the state under the police power to require automobile registration is unquestioned, the exaction at issue could not have been levied

---

[7] *Ante,* p 154.

[8] See 1 Couch, Insurance (2d ed), § 1.2, pp 28-29.

validly as a regulatory fee.[9] In *Vernor v Secretary of State,* 179 Mich 157, 164, 170; 146 NW 338 (1914), this Court held that a motor vehicle registration fee in excess of the cost of registering and identifying motor vehicles must be regarded as a tax. *Vernor* states that the Legislature may not use the police power as a "guise or subterfuge" to enact revenue-raising measures. Subsequent decisions of this Court have followed *Vernor,* reaffirming that regulatory fees cannot exceed the cost of the special services required by the regulation. See, *e.g., Checker Cab Co v Romulus Twp,* 371 Mich 232; 123 NW2d 772 (1963) (township ordinance licensing and regulating the use of taxicabs held invalid as an exercise of the police power because the revenues raised far exceeded the cost of administration and enforcement); *Merrelli v St Clair Shores,* 355 Mich 575; 96 NW2d 144 (1959)

---

[9] *Ante,* p 160.

Appellees contend that they paid a $45 license fee on April 1, 1973, for the privilege of driving uninsured for one year and, on the authority of cases requiring a pro-rata refund where a license is canceled before the licensing year ends, that because the privilege was terminated midyear they are entitled to a refund of $22.50. Elsewhere in this opinion we state why this governmental exaction cannot be sustained as a regulatory fee or tax, but is valid as an assessment. Further, even if appellees did purchase for $45 a license conferring the privilege of driving uninsured, the license and privilege was not terminated midyear when the no-fault automobile liability act went into effect. The period for which such a license and privilege was granted was shortened *before* it began when the no-fault automobile liability act, requiring all motorists to be insured on October 1, 1973, was enacted as 1972 PA 294 and approved by the Governor on October 31, 1972. The effect of the shortening of the period for which such a license and privilege was granted was to increase the fee required to be paid annually at the time of registration of an uninsured motor vehicle to $45 for the six-month period ending September 30, 1973. (The words "for the 1966 registration year, and for each year thereafter" were eliminated by 1971 PA 19.)

The power, purpose, and intent of the Legislature to assess owners of uninsured vehicles in such amounts as was thought necessary to provide adequate money to pay the benefits mandated by the MVACA is clear. As set forth in Parts VII and VIII, to the extent the money collected exceeds the needs of the Fund, such excess should be refunded to those from whom it was excessively exacted.

(fees for building permits found to be revenue-raising measure because they exceeded the costs of building inspection). As the title of MCL 257.1101 *et seq.;* MSA 9.2801 *et seq.,* makes clear, the money collected for the Motor Vehicle Accident Claims Fund was not intended to be used for regulatory purposes.[10]

There is no meaningful difference between insured and uninsured motorists in terms of the costs to the state of regulating their driving. Accordingly, a regulatory scheme charging owners of uninsured vehicles a $45 fee and owners of insured vehicles a $1 fee for the privilege of driving[11] would not have been valid.

### III

We do not agree, however, with the majority's characterization of this exaction as a tax. Characterizing this exaction as a tax places the MVACA in conflict with two provisions of the Michigan Constitution. This exaction from owners of uninsured vehicles, which could not have been levied validly as a regulatory fee, also could not have been levied validly as a tax.

---

[10] The title, in relevant part, states:

"AN ACT providing for the establishment, maintenance and administration of a motor vehicle accident claims fund for the payment of damages for injury to or death of certain persons or property damage arising out of the ownership, maintenance or use of motor vehicles in the state in certain cases".

[11] The owners of uninsured vehicles were first required to contribute $25 (1965 PA 198)—raised to $35 by 1965 PA 389, and to $45 by 1971 PA 19—to the Fund annually, and until at least 1971 (see 1971 PA 19) the owners of insured vehicles were required to contribute $1 annually. MCL 257.1103; MSA 9.2803. Because more owners of insured vehicles contributed than did owners of uninsured vehicles, it appears that contributions from owners of insured vehicles aggregated approximately one-quarter of the total amount paid into the Fund over the years the fees were collected.

Before its amendment in 1978, article 9, § 9 of the 1963 Michigan Constitution provided that

"[a]ll specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after the payment of necessary collection expenses, be used *exclusively for highway purposes as defined by law.*" (Emphasis supplied.)

The Legislature did not "define" as a "highway purpose" the payment of benefits to the victims of accidents caused by uninsured motorists. Even if it had, it is questionable that the persons who proposed and voted for this constitutional limitation intended the phrase "highway purposes" to have a meaning so collateral to the construction and maintenance of highways and bridges.[12] A tax on

[12] In *Advisory Opinion on Constitutionality of 1976 PA 295, 1976 PA 297,* 401 Mich 686, 705-707; 259 NW2d 129 (1977), this Court indicated that the words "as defined by law" gave the Legislature a substantial amount of flexibility in defining the term "highway purposes". The "as defined by law" language does not, however, confer on the Legislature unlimited power of definition.

In 1978, art 9, § 9 was amended to read:

"All specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and to propel aircraft and on registered motor vehicles and aircraft shall, after the payment of necessary collection expenses, be used exclusively for transportation purposes as set forth in this section.

"Not less than 90 percent of the specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after the payment of necessary collection expenses, be used exclusively for the transportation purposes of planning, administering, constructing, reconstructing, financing, and maintaining state, county, city, and village roads, streets, and bridges designed primarily for the use of motor vehicles using tires, and reasonable appurtenances to those state, county, city, and village roads, streets, and bridges.

"The balance * * * shall be used exclusively for the transportation purposes of comprehensive transportation purposes as defined by law."

the registration of uninsured vehicles to provide funds for the victims of uninsured motorists cannot be sustained consistent with art 9, § 9 of the Michigan Constitution.

The majority intimates in a footnote that this exaction might conflict with Const 1963, art 9, § 9 if viewed as a tax, but argues that the issue need not be addressed because appellees have not sought the proper relief for a validly imposed but unconstitutionally spent tax.[13] That argument presupposes, however, that the exaction in question would have been validly imposed had the funds been used for traditional highway purposes; that is not the case. Article 9, § 3 of the Michigan Constitution provides that a tax other than an ad valorem tax must be "uniform upon the class or classes on which it operates". A registration tax for traditional highway purposes charging some owners a $45 fee and others a $1 fee would violate that constitutional provision. For the foregoing reasons, the MVACA exaction could not have been levied constitutionally as a tax.[14]

The new language makes even more doubtful the validity of the use of a specific tax on registered motor vehicles to pay benefits to the victims of uninsured motorists.

[13] *Ante*, p 164, fn 5.

[14] The majority appears to expect omniscience from appellees by requiring them to know that a majority of this Court would characterize this exaction as a tax. Considering that this exaction would have been imposed unconstitutionally had it been a tax and that the Attorney General has several times rejected the notion that this exaction was a tax, initially expressing the opinion that this exaction could only be constitutional as a regulatory fee (letter of December 8, 1970, from the Attorney General to the Chairman of the Committee on Appropriations), and most recently expressing the view that this exaction was an assessment, see fn 4, it is understandable that appellees believed some relief other than injunction to be appropriate.

Ordinarily, the proper procedure for challenging an invalidly imposed tax or assessment is to pay the tax or assessment under protest and to commence an action for a refund. Protest is not always required, however. For example, when a tax or assessment collected is in excess of the proper amount because of a mutual mistake of fact,

IV

Special assessments of specific groups to provide revenue for the benefit of specific persons or property are not considered to be "taxes" for the purposes of state constitutional limitations. *Dukesherer Farms, Inc v Dep't of Agriculture (After Remand),* 405 Mich 1; 273 NW2d 877 (1979); *Wikman v City of Novi,* 413 Mich 617, 634, fn 9, 683, fn 59; 322 NW2d 103 (1982); *Newman v City of Indianola,* 232 NW2d 568 (Iowa, 1975); *Heavens v King County Rural Library Dist,* 66 Wash 2d 558; 404 P2d 453 (1965); Hellerstein & Hellerstein, *State and Local Taxation* (4th ed), pp 43-44. In *Dukesherer Farms,* this Court held that the Agricultural Commodities Marketing Act, MCL 290.651 *et seq.;* MSA 12.94(21) *et seq.,* imposed an "assessment" rather than a "tax" because the funds came from producers directly affected by the marketing program and were required to be disbursed solely for necessary expenses incurred by the marketing program. Concluding that the special assessment was not an unconstitutional use of the taxing power, this Court, quoting a decision of the United States Supreme Court, said:

"It is inaccurate and misleading to speak of the exaction from processors prescribed by the challenged act as a tax, or to say that as a tax it is subject to no infirmity. *A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government. The word has never been thought to connote the expropriation of money from one group for the benefit of another.* We

or if a tax or assessment is paid under duress, no protest is required. In the instant case, appellees could not have known that the assessment was excessive until the purpose of the Fund was met and a surplus remained. Their suit for a refund was both timely and appropriate when filed.

may concede that the latter sort of imposition is constitutional when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation." (Emphasis supplied.) *Dukesherer Farms,* pp 19-20, quoting *United States v Butler,* 297 US 1, 61; 56 S Ct 312; 80 L Ed 477 (1936).

Like *Dukesherer Farms,* this case involves an assessment to raise money to cover a particular need that has a sufficient nexus with the persons assessed to justify the imposition. If collected as an assessment, this exaction was valid.

## V

It is a maxim of statutory construction that an act of a legislature should not be construed to be invalid if another construction is available. *NLRB v Catholic Bishop of Chicago,* 440 US 490, 500; 99 S Ct 1313; 59 L Ed 2d 533 (1979); *Kent v Dulles,* 357 US 116, 129-130; 78 S Ct 1113; 2 L Ed 2d 204 (1958); Posner, *Statutory Interpretation—in the Classroom and in the Courtroom,* 50 U Chi L Rev 800, 814-816 (1983) (suggesting that construing statutes to avoid unconstitutionality is the only canon of statutory interpretation that has merit). Because the exaction from owners of uninsured vehicles could have been validly collected as an assessment, but not as either a regulatory fee or as a tax, we would hold that the exaction was a variety of special assessment.

## VI

Unlike general revenue-raising measures, special assessments create special funds designed to be used for a specific purpose. As this Court noted in *Dukesherer Farms, supra,* p 20 "the spending of

sums acquired through assessment must be rigidly defined and the money collected must be segregated from all other accounts". See also *City of Searcy v Headlee,* 222 Ark 719; 262 SW2d 288 (1953); *Bourland v Southard,* 185 Ark 627; 48 SW2d 555 (1932); *Ochs v Town of Hot Sulphur Springs,* 158 Colo 456; 407 P2d 677 (1965); *People ex rel Drobnick v City of Waukegan,* 1 Ill 2d 456; 116 NE2d 365 (1953); *Campbell v Village of Green Tree,* 59 NM 255; 282 P2d 1101 (1955); *Chicago R I & P R Co v Stephens County Excise Bd,* 165 Okla 188; 25 P2d 70 (1933); *Brookings v Associated Developers, Inc,* 280 NW2d 97 (SD, 1979); *McGraw v Hansbarger,* — W Va —, —; 301 SE2d 848, 857-858 (1983); 81A CJS, States, § 228, p 798; 42 Am Jur, Public Funds, § 79; 14 McQuillin, Municipal Corporations (3d ed), § 38.336, p 731. Accordingly, the state had a duty to segregate the Fund for the victims of uninsured motorists and to ensure that the money in the Fund was not transferred to the state's general fund. The state disregarded that duty in 1971 when the Legislature transferred accumulated assets of the Fund to the state's general fund.[15]

In addition to having a duty to segregate the Fund from the general fund, the state had a duty to ensure that the Fund earned interest on the moneys collected for the Fund.[16] It is well established that money collected by virtue of a special assessment constitutes a trust fund and that the governmental body collecting the assessment is the trustee of the fund. See, *e.g., Fidelity Trust Co v*

---

[15] 1971 PA 19.

[16] The MVACA provided that the unappropriated moneys in the Fund be deposited to earn interest. 1971 PA 19, § 3(1); 1971 PA 63, § 3(1); MCL 257.1103; MSA 9.2803. Over $2.5 million in interest was credited to the Fund in each of fiscal years 1969 and 1970, but, after the borrowing, by the state, less than 10% of those amounts was credited in fiscal year 1971.

*Village of Stickney,* 129 F2d 506 (CA 7, 1942); *Willard v City and County of Honolulu,* 323 F Supp 666 (DC Hawaii, 1971); *State ex rel Taylor v Robison,* 59 Idaho 485, 491; 83 P2d 983 (1938); *Sampson v Village of Stickney,* 24 Ill 2d 134; 180 NE2d 457 (1962); *People ex rel Drobnick, supra; People ex rel Anderson v Village of Bradley,* 367 Ill 301; 11 NE2d 415 (1937); *Lesser v Village of Mundelein,* 36 Ill App 3d 433; 344 NE2d 29 (1975); *Village of Dolton v Harms,* 327 Ill App 107; 63 NE2d 785 (1945); *Lynn v City of Longview,* 15 Wash 2d 528; 131 P2d 164 (1942). It is also "well established that conduct of the Government as a trustee is measured by the same standards applicable to private trustees". *Manchester Band of Pomo Indians, Inc v United States,* 363 F Supp 1238, 1245 (ND Cal, 1973). A trustee who borrows from a trust fund must pay interest. *Langford v Shamburger,* 392 F2d 939 (CA 5, 1968). The failure of the state to pay interest to the Fund on the money transferred from the Fund to the state's general fund was a violation of the state's fiduciary duty.[17] To allow the state to borrow money from a trust fund raised by a special assessment of a discrete group of persons without the payment of interest would enable it to do indirectly what it cannot do directly—to enlarge the general fund at the expense of the trust. It would subject the members of the discrete group to further assessment necessitated by a shortfall of funds resulting from the state's use of money belonging to the trust fund without the payment of interest. It appears that if the Fund had received the interest to which it was entitled, it might currently have a surplus after providing for liabilities.

[17] The Legislature originally promised to pay interest on the money that it borrowed, 1971 PA 19, § 3a, but subsequently deleted the subsection providing for interest, 1976 PA 89, § 3a. MCL 257.1103a; MSA 9.2803(1).

## VII

In situations involving land improvements, when the purpose of a special assessment has been met and money remains in the special fund, the excess belongs to the persons who have contributed to the fund in proportion to the amount of their original contribution. *Chicago R I & P R Co v Stephens County Excise Bd,* 165 Okla 188; 25 P2d 70 (1933); *Miller v City of Seattle,* 50 Wash 252, 254-255; 97 P 55 (1908).[18] McQuillin, *supra,* § 38.336, p 731, writes:

"Landowners paying special assessments to a fund to pay bonds issued to cover the actual cost and expense of the improvement in excess of the sum required, due to miscalculation or mistake, are, in equity, justly entitled to have such excess refunded to them, each landowner to receive the excess paid by him, that is, the excess should be prorated among the property owners, as it may appear that each has paid. Such money, when collected from the several property owners becomes a trust fund, to be used only for the purpose specified, and when the bonds and interest and other legal expenses chargeable against such fund have been satisfied, the balance belongs to the landowners. Each lot or parcel of land in the improvement district must bear its equal share in the total cost and no more."

Admittedly, the Motor Vehicle Accident Claims Fund is somewhat different than a fund set aside

---

[18] Refunds from excessive special assessments have been provided for in legislation. See, *e.g., Wylie v City Comm of Grand Rapids,* 293 Mich 571; 292 NW 668 (1940); *Smith v City Comm of Grand Rapids,* 281 Mich 235; 274 NW 776 (1937); *Blanchard v Detroit,* 253 Mich 491; 235 NW 230 (1931); *Thayer v Grand Rapids,* 82 Mich 298; 46 NW 228 (1890). Although the Legislature has not provided for a refund of the surplus of this assessment, that does not mean that appellees are not entitled to such relief; a court of equity may grant a refund. As this Court said in *Blanchard,* p 495, "in the absence of statutory provision to the contrary, [the surplus from a special assessment] may be recovered, although there is no express statutory provision therefor".

for a specific land improvement because the purpose of the Fund is less well defined and those being assessed are not the direct beneficiaries. The Legislature may, as it did,[19] enlarge the benefits or the time limits respecting the Fund as long as it devotes the money to purposes consistent with those for which the money was exacted. Although the question is not before us, it may even be that the persons to be benefited by the creation of the Fund could claim the right to have a court apply the Fund to the purposes sought to be served by its establishment. Absent such a claim by such persons, or such a determination by the Legislature, the money that would be in the Fund but for the state's failure to pay interest must be returned to the class or classes of persons from whom it was excessively exacted.

## VIII

Because at this time it is unclear how much surplus will remain in the Fund after its purpose has been met and the money owed to it as interest has been paid, we would remand for proceedings consistent with this opinion. If after calculating the interest owed and making provision for the benefits remaining to be paid, the circuit court finds that the Fund has a surplus, such surplus should be refunded to those from whom it was collected.

## IX

In conclusion, this cause concerns a governmen-

[19] Although the no-fault automobile liability act went into effect on October 1, 1973, by virtue of 1974 PA 223 the Fund remained liable for damages arising out of accidents involving uninsured vehicles that occurred before July 26, 1974. 1975 PA 322 extended until January 2, 1976, the benefits of the act for certain actions.

tal exaction that cannot be readily pigeonholed as a regulatory fee, a specific tax, or an assessment. Because it could not have been levied validly either as a regulatory fee or as a tax, and because it was an assessment of a specific group to meet a specific problem related to that group, we conclude that this exaction from owners of uninsured and insured vehicles was an assessment. As an assessment, it was validly levied, but the money exacted cannot be placed in the general fund. Absent claims by the beneficiaries of this trust fund, the moneys in the Fund, including the interest that is due the Fund, less an amount equal to the liabilities of the Fund, should be refunded to those from whom it was collected.

Although no member of the appellee class would receive a large sum as a result of appellees' success in this action, recognition of appellees' rights today would prevent the state from unconstitutionally appropriating to the general fund money excessively exacted from a discrete group of persons. The power to assess, like the power to tax, "involves the power to destroy".[20] When the Attorney General defends the action of the state, it is a function of the private bar and civil litigation to hold that power in check.

We would remand for further proceedings consistent with this opinion.

KAVANAGH, J., concurred with LEVIN, J.

---

[20] *M'Culloch v Maryland,* 17 US (4 Wheat) 316, 431; 4 L Ed 579 (1819).